**ORAL ARGUMENT NOT SCHEDULED**

**No. 26-1046**
**(consolidated with No. 26-1032)**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————

MARTIN LUTHER KING, JR. COUNTY,
*Petitioner*,

v.

SEAN P. DUFFY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE
U.S. DEPARTMENT OF TRANSPORTATION, et al.,
*Respondents*.

———————

On Petition for Review of a Rule of the
Federal Motor Carrier Safety Administration

———————

**RESPONSE TO EMERGENCY MOTION FOR**
**STAY PENDING REVIEW**

———————

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
SIMON G. JEROME
GABRIEL I. SCHONFELD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7219*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3306*
  *gabriel.i.schonfeld@usdoj.gov*

**INTRODUCTION**

Because of the danger large commercial vehicles pose to other drivers, federal law has long set standards for the issuance of commercial driver's licenses (CDLs).  From the beginning, those standards have required that States issuing CDLs obtain and review an applicant's driving history from any State where the applicant previously held a driver's license to determine if prior violations call into question the applicant's fitness for a CDL.  States, however, cannot review similar driving history records of aliens not domiciled in the United States, as their driving histories are entirely or predominantly abroad and States cannot compel the production of such records.  That presents a significant safety risk, as multiple studies have demonstrated that past driving performance is a robust predictor of future risk.

On February 13, 2026, recognizing the risks inherent in granting CDLs to individuals whose driving histories cannot be reviewed, the Federal Motor Carrier Safety Administration (FMCSA) published a rule limiting eligibility for CDLs for all but three categories of non-domiciliary aliens who undergo vetting that adequately substitutes for the States' inability to access foreign driving history.  The Rule also changes the regulations governing the issuance of non-domiciled CDLs to simplify state compliance with those

regulations after FMCSA reviews revealed that more than 30 jurisdictions had systemic and widespread errors in their issuance of non-domiciled CDLs.

Neither the merits nor the equities justify interim relief.  FMCSA has ample statutory authority to issue the Rule.  Petitioner's remaining arguments overlap with the stay motion in the consolidated *Lujan* case, *see* No. 26-1032, and fail for largely the same reasons.  Moreover, petitioner has not demonstrated imminent and irreparable harm, and a stay would disserve the public interest by undermining the Rule's important safety benefits. This Court should deny the motion.

**STATEMENT**

1.  In 1986, commercial truck drivers posed a serious threat to the nation's highways, with crashes involving large trucks and buses killing 5,895 people that year alone.  FMCSA, Large Truck & Bus Crash Facts 2020, at 4 (Sep. 2022), https://perma.cc/A2C7-WE5S.

Congress addressed the problem through the Commercial Motor Vehicle Safety Act of 1986.  Pub. L. 99–570, tit. XII, 100 Stat. 3207-170.  As amended, the Act aims "to eliminate unsafe commercial drivers and equipment" from U.S. roads.  132 Cong. Rec. S16919 (daily ed. Oct. 17, 1986)

2

(statement of Sen. Danforth).  To operate certain large vehicles, individuals are required to obtain one (and only one) CDL, 49 U.S.C. § 31302, and to notify their employers of any driving violations, *id.* § 31303.  Employers are prohibited from using drivers they know (or reasonably should know) are not properly credentialed.  *Id.* § 31304.  The Secretary of Transportation (acting through FMCSA) is required to prescribe "minimum standards for testing and ensuring the fitness of" a commercial driver, *id.* § 31305(a), and to establish an alcohol-and-drug testing program, *id.* § 31306.  And, as a condition of receiving certain federal highway funds, States must enforce the standards FMCSA sets.  *Id.* § 31311(a)(1).

Generally, States may issue CDLs only to their domiciliaries.  49 U.S.C. § 31311(a)(12)(A).  But FMCSA may prescribe conditions under which a non-domiciliary may obtain a CDL.  *Id.* § 31311(a)(12)(B)(ii).  Under that authority, FMCSA in 2011 created a category of "non-domiciled" commercial driver's license for (as relevant here) applicants domiciled outside the United States.  76 Fed. Reg. 26,854, 26,878 (May 9, 2011).

The substantive requirements for non-domiciled and domiciled CDLs are largely identical.  *See* 49 C.F.R. § 383.71; *id.* § 383.73.  This includes a requirement that States obtain the "complete driving record" of the

3

applicant from any "State[] where the applicant was previously licensed over the last 10 years." *Id.* § 383.73(b)(3)(iv).  States are also required to check the Problem Driver Pointer System, Drug and Alcohol Clearinghouse, and Commercial Driver's License Information System.  *Id.* § 383.73(b)(3)(ii), (iii), (10).

These requirements, however, are of limited use when an applicant is domiciled outside the United States.  Many such applicants—including parolees and asylees—will have little domestic driving history, if any, and virtually all their relevant driving history will be found abroad where States cannot access it.  *See* 91 Fed. Reg. 7044, 7048-49 (Feb. 13, 2026).

2.  To ensure compliance with the Act and its implementing regulations, FMCSA undertakes annual "review[s] to determine whether … the State meets the general requirement for substantial compliance."  49 C.F.R. § 384.307(a).  In 2025, FMCSA's State-by-State reviews revealed "systemic procedural and computer programming errors, significant problems with staff training and quality assurance, and policies that lack[ed] sufficient management controls."  91 Fed. Reg. at 7063.  FMCSA also observed that States had significant difficulty assessing aliens' eligibility for non-domiciled CDLs using Employment Authorization Documents (EADs) issued by

4

Federal immigration authorities. For example, clerks at state driver's licensing agencies regularly had difficulty distinguishing between EAD "codes" that indicated an individual's basis for presence in the United States, and thus would frequently issue non-domiciled CDLs to ineligible individuals. *Id.* at 7052. States also routinely issued or renewed CDLs without valid documentation, accepting expired EADs with United States Citizenship and Immigration Services (USCIS) forms purportedly granting extensions but not authorized in FMCSA's regulations. *Id.* Moreover, States commonly issued non-domiciled CDLs with expiration dates exceeding the applicant's authorized period of lawful presence. *Id.* at 7045, 7063. All told, FMCSA "identified more than 30 States that failed to comply with the non-domiciled … CDL regulations," *id.* at 7051; *see also* FMCSA, *List of States FMCSA Determined Were in Substantial Noncompliance* (Feb. 12, 2026), https://perma.cc/JZJ8-G8NT, resulting in "tens of thousands non-domiciled CDLs" issued inconsistent with federal law, 91 Fed. Reg. at 7045. New York and Texas, for example, "demonstrated staggering error rates of 53 and 49 percent respectively." *Id.*

FMCSA further identified—in 2025 alone—at least 17 fatal accidents involving 30 deaths in which non-domiciled CDL holders were at fault. These

5

were CDL holders who FMCSA determined would not have been eligible for licensure under the Rule.  91 Fed. Reg. at 7065-67.

3.  FMCSA highlighted these concerns in promulgating and seeking comment on an interim final rule (IFR), *see* 90 Fed. Reg. 46,509 (Sep. 29, 2025), which this Court then stayed pending review, Order, *Lujan v. FMCSA*, No. 25-1215 (D.C. Cir. Nov. 13, 2025).  Subsequently, FMCSA published a final rule that addresses comments on the IFR and provides substantially greater explanation of FMCSA's regulatory changes.  The Rule takes effect March 16, 2026.  91 Fed. Reg. at 7044.

Previously, any alien domiciled outside the United States who possessed an unexpired EAD was eligible to obtain a CDL, despite the States' inability to obtain that individual's foreign driving history.  49 C.F.R. § 383.71(f)(2)(i) (2021).  The Rule explains that this gap "severely limits the effectiveness of [the] vetting processes" States are ordinarily required to conduct for CDL applicants because "a driver's historical performance, whether measured through crashes, violations, or observable risky behaviors, provides a robust basis for predicting future safety outcomes on the road." 91 Fed. Reg. at 7048-49.

6

To address this concern, the Rule limits non-domiciled CDL eligibility to individuals maintaining lawful immigration status in H-2A, H-2B, and E-2 employment-based nonimmigrant categories.  49 C.F.R. §§ 383.71(f)(3)(i)(B), 383.5.  The Rule explains that as a "functional proxy for" driving-history verification by States, 91 Fed. Reg. at 7044, aliens in these categories undergo "federal vetting processes … including consular screening, labor certification requirements, and employer verification[ that ]provide[] sufficient assurance of driver fitness to mitigate the safety gap created by [States'] inability to access and verify the foreign driving records," *id.* at 7049-50.  The Department of State confirmed that consular adjudication of visa status for the eligible categories includes an "assess[ment of] certain factors relevant to both visa eligibility and [commercial motor vehicle] driver fitness, including … driving history, occupational qualifications, and English language proficiency."  *Id.* at 7050.  Additionally, consular adjudication "generally include[s] requests for 10 years of driving history, past traffic violations, license suspensions and revocations, and other similar records," *id.* at 7060, aligning with the 10-year domestic driving history States must consult, 49 C.F.R. § 383.73(b)(3)(iv).  In turn, employers sponsoring aliens for H-2A and H-2B visas are required "to list the qualifications necessary for the

position, which for [commercial motor vehicle]-related positions typically include[] driving experience, clean driving records, and English proficiency." 91 Fed. Reg. at 7050.

Additionally, because it can take 75 days or more to sponsor a replacement for an H-2A or H-2B visa holder who becomes ineligible, employers have strong incentives to diligently screen individuals they sponsor for those visas. *See* 91 Fed. Reg. at 7050; *see also* 90 Fed. Reg. at 46,516 & n.25. Finally, eligible visa holders "are subject to ongoing federal oversight through multiple agencies … via the nonimmigrant status and visa renewal processes, creating multiple points of verification and accountability." 91 Fed. Reg. at 7050. For example, the Department of State "constantly reviews available information on current U.S. visa holders, and revokes visas when there is an indication of a potential ineligibility or in other situations where warranted." *Id.*

4. Petitioner operates a public bus system, Mot. 8, employing about 2,600 drivers, Eldred Decl. ¶ 14, about 45 of which hold non-domiciled CDLs ineligible for renewal under the Rule, *id.* ¶ 31. Petitioner sought review of the Rule on March 4, 2026. The same day, petitioner requested that FMCSA stay the Rule's effect. Pet. Addendum 2. FMCSA denied that request on

March 5.  Pet. Addendum 3.  The following day, petitioner moved for a stay pending review.

## ARGUMENT

To obtain interim relief, petitioner must show a likelihood of success on the merits, irreparable harm, and that the harm to third parties and the public interest support interim relief.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Petitioner has not met that burden.

Petitioner's stay motion overlaps in substantial part with the fully-briefed stay motion filed by petitioners in the consolidated petition for review, *Lujan v. FMCSA*, No. 26-1032.  We thus begin by addressing the arguments raised only by King County before addressing the points of overlap.

## I.     Petitioner Is Not Likely to Succeed on the Merits

### A.     FMCSA Has Statutory Authority to Promulgate the Rule

Congress has provided that States are generally barred from issuing CDLs to non-domiciled individuals, 49 U.S.C. § 31311(a)(12)(A), but has empowered the agency to "prescribe regulations" under which States may issue licenses to such persons, *id.* § 31311(a)(12)(B)(ii).  Congress has also

granted the agency authority to prescribe uniform "minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle," *id.* § 31305(a), as well as authority to "prescribe regulations on minimum uniform standards for the issuance of commercial drivers' licenses," *id.* § 31308. The Rule here amends the documentation requirements for obtaining a non-domiciled CDL, while also ensuring that aliens eligible to obtain non-domiciled CDLs have had their driving history vetted in a manner comparable to domestic CDL holders. Those changes are comfortably within FMCSA's statutory authority to prescribe standards for CDL and non-domiciled CDL issuance and to "ensur[e] the fitness" of CDL holders, particularly given the importance of driving history as a predictor of future accidents. *See* 91 Fed. Reg. at 7046, 7057, 7058.

Petitioner does not apparently dispute that driving history is an important safety-related consideration for the issuance of a CDL. Nor does it directly address the agency's express authority to set criteria for the issuance of non-domiciled CDLs under § 31311(a)(12)(B)(ii). It instead suggests that the authority in § 31305(a) is limited to certain "regulatory tasks" related to "testing driver safety." Mot. 10-11. But § 31305(a) itself refers to both "standards for testing *and* ensuring the fitness" of a CDL

10

applicant. 49 U.S.C. § 31305(a) (emphasis added). Given petitioner's apparent recognition that a driver's prior record is a significant safety consideration, it is difficult to see why the Rule's exclusion from eligibility of classes of individuals whose foreign driving record *cannot* be ascertained would be any less within the agency's authority. And even if § 31305(a) were not so clearly applicable, it would still be well within the agency's authority in prescribing regulations governing CDL issuance to persons "not domiciled in a State that issues commercial driver's licenses," *id.* § 31311(a)(12)(B)(ii), to ensure that non-domiciled drivers go through the same or equivalent vetting processes as domiciled drivers. That is particularly so given that drivers may be disqualified based on their foreign driving history. *See* 91 Fed. Reg. at 7048 (noting that the Rule "ensures consistent application of the laws disqualifying drivers … from holding a CDL" after certain offenses, violations, or adverse license actions). Congress's determination to allow States to issue non-domiciled CDLs only pursuant to regulations promulgated by FMCSA underscores the agency's authority to calibrate those regulations to the unique challenges posed by licensure of non-domiciled CDL holders, and petitioner identifies nothing in the statutory

scheme that requires the agency to ignore States' inability to access foreign driving history in setting criteria for non-domiciled CDLs.

Petitioner waves away these concerns by asserting that the Rule "fundamentally concerns immigration status" rather than safety. Mot. 10. But as discussed, immigration status is relevant here only insofar as it relates to the accessibility of driving records by licensing agencies within the United States and the availability of alternative vetting mechanisms. *E.g.*, 91 Fed. Reg. at 7049-50. Petitioner's assertion (Mot. 12-13) of conflict with the Immigration and Nationality Act is likewise meritless. Employers may be obligated to verify prospective employees' employment status, *id.*, but generic work authorization does not mean suitability for any and every job.

Similar errors underlie petitioner's allegations of pretext. Mot. 24-26. There exists a strong "presumption that public officials 'have properly discharged their official duties,'" *Hight v. DHS*, 135 F.4th 996, 1008 (D.C. Cir. 2025) (quoting *United States v. Chemical Found.*, 272 U.S. 1, 15 (1926)), and, as petitioner concedes, any review (including for pretext) "is generally limited to the administrative record," Mot. 24 (citing *Department of Com. v. New York*, 588 U.S. 752, 780 (2019)). Here, the "evidence" of the problem the agency identified "match[es]" precisely the Rule's intervention, *Department*

12

*of Com.*, 588 U.S. at 784, as there is no dispute that State agencies cannot obtain foreign driving histories and petitioner does not seriously dispute that driving history is relevant to safety.  The rationality of that explanation is the beginning and end of the inquiry, even crediting petitioner's speculative assertions that the agency had "other unstated reasons" in promulgating the Rule.  *Id.* at 781.

Furthermore, petitioner cannot justify looking beyond the administrative record to extra-record statements or other actions taken by the agency or the President.  Mot. 24-25.  Indeed, petitioner cites no binding authority that would suggest such a step is proper; the only decision on which it relies is an out-of-circuit decision in which, unlike here, the extra-record statements were directly opposed to the policy adopted in the rule under review.  *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021); Mot. 24-25.

### B. The Rule Reasonably Restricts the Eligibility of Individuals Whose Driving History Cannot Be Assessed

Petitioner's remaining arguments substantially overlap with, or simply repeat, arguments advanced in the *Lujan* stay motion and are mistaken for the same reasons.

The Rule primarily addresses a safety gap identified by FMCSA, which is charged with establishing and enforcing nationwide uniform standards for CDL issuance.  From the beginning of federal oversight of CDL issuance, the need to review a CDL applicant's driving history has been recognized as a critical safety need, as the States' inability to access a single, reliable driving record for applicants was recognized as a "major area[] of concern." 52 Fed. Reg. 20,574, 20,576 (June 1, 1987).  As FMCSA explained, multiple studies conducted over decades have demonstrated that "a driver's historical performance, whether measured through crashes, violations, or observable risky behaviors, provides a robust basis for predicting future safety outcomes on the road."  91 Fed. Reg. at 7048-49; *see id.* at 7098-99 (describing study showing reckless driving citations translating to 325% higher risk of future crashes).  For example, an FMCSA literature review found that "drivers with prior crash involvement were 87 percent more likely to be involved in a future crash," *id.* at 7048, while an industry study repeated on multiple occasions over the last two decades found that "reckless driving violations and past crashes" are among the "top five stable predictors of crash risk," *id.*

FMCSA also explained that it is impossible for States to review the foreign driving histories of many non-domiciled CDL applicants because

14

those records are inaccessible.  91 Fed. Reg. at 7049.  Consequently,

"nondomiciled applicants have been subject to a lower level of scrutiny in the

… CDL application process than U.S.-domiciled individuals."  *Id.* at 7048.

"This regulatory blind spot permits individuals with potentially poor safety

records or permanently disqualifying convictions to obtain non-domiciled

CDLs, placing all roadway users at risk."  *Id.* at 7089.  Thus, FMCSA

determined that limiting the eligibility of classes of potential applicants

whose driving history cannot be ascertained "closes a significant safety gap,"

*id.* at 7048, and will likely "improve[] safety outcomes," *id.* at 7098.  FMCSA

further determined that certain classes of non-immigrant visa holders go

through "federal vetting processes" that "provide[] sufficient assurance of

driver fitness to mitigate" that gap and thus that individuals in those

categories should remain eligible for non-domiciled CDLs.  *Id.* at 7049-50.

In reaching this conclusion, FMCSA explained that the databases

available do not "allow FMCSA to ascertain" whether a driver involved in a

particular fatal crash or other incident "was, or should have been, designated

as non-domiciled," and that in the face of this uncertainty the need for the

Rule followed from the "critical safety vulnerability" created by "the inability

of [States] to verify foreign driver histories."  91 Fed. Reg. at 7065; *accord,*

15

*e.g.*, *id.* at 7067 ("Licensing a driver without the ability to investigate their history … removes a critical layer of defense in accident prevention.").

Petitioner primarily mischaracterizes the Rule as premised on speculation about the "relationship between immigration status and driver safety." Mot. 13-15. As discussed, that is not the case. Instead, States cannot assess with the same degree of confidence a non-domiciled applicant's safety because those individuals—who are all aliens—tend to have driving histories outside the reach of States. As FMCSA explained, there is ample evidence that driving history is a strong indicator of future safety.

Petitioner does not dispute or even engage with the evidence that driving history is a strong predictor of future safety. It instead emphasizes the unavailability of data "regarding the type of CDL held" by drivers involved in accidents. Mot. 13-14 (quotation marks omitted). But because of the inherent limitations of present data, the absence of definitive evidence runs both ways: petitioner likewise cannot identify evidence FMCSA overlooked that demonstrates that non-domiciled CDL holders are safer than other CDL holders, and FMCSA was not obligated "to conduct or commission [its] own empirical or statistical studies" before acting. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021). Instead, "[i]n the face of

16

'serious uncertainties,'" FMCSA is free to assess the appropriate margin of safety the regulations should adopt, so long as FMCSA "explain[s] the evidence which is available, and offer[s] a rational connection between the facts found and the choice made," *North Carolina v. FERC*, 112 F.3d 1175, 1190 (D.C. Cir. 1997) (alteration and quotation marks omitted).  FMCSA did so here.

Petitioner likewise misses the point in observing (Mot. 16) that *other* requirements, such as testing and training requirements, are the same for both non-domiciled CDL holders and other CDL holders.  As FMCSA explained, past driving history is a powerful predictor of future driving safety, which is precisely why FMCSA believed the previous system created "an unacceptable bifurcated standard in driver vetting."  91 Fed. Reg. at 7044.  Indeed, on petitioner's theory, the existence of other requirements would mean driving history checks are of no value even for domiciled CDL holders.  But the importance of those checks is precisely why Congress mandated that a State consult driving history from other States before issuing a CDL.  100 Stat. at 3207–180.

Petitioner's assertions of a purported mismatch between this rationale and the Rule (Mot. 16-22) are meritless.  Petitioner's claim that the Rule is

17

overinclusive because it denies eligibility to some individuals who might have domestic driving records does not render the Rule arbitrary.  Mot. 16-17.  To begin, FMCSA explained that the exclusion of Deferred Action for Childhood Arrivals (DACA) recipients from eligibility was not premised on lack of access to driver history information, but instead for administrability reasons discussed below.  *See infra* pp. 23.  But more fundamentally, it was reasonable for FMCSA to conclude that *as a class*, aliens excluded from CDL eligibility under the Rule are likely to have significant foreign driving records relevant to their fitness for licensure.  *See Magnetsafety.org v. CPSC*, 129 F.4th 1253, 1264-65 (10th Cir. 2025) (upholding a rule based on likely group characteristics as reasonable).

Nor does the Rule arbitrarily apply "greater scrutiny" to the foreign driving records of non-domiciled drivers versus domiciled ones.  Mot. 17-18.  Indeed, the premise of the Rule is that because States are unable to reliably verify *any* foreign driving record, additional assurances of fitness are required.  For domiciled CDL holders, those assurances are provided by "four distinct checks" of their domestic driving history, 91 Fed. Reg. at 7049, as well as the requirement that they surrender other driver's licenses (which prevents them from evading State oversight by "operat[ing] in a foreign

country while their … CDL is valid"), *id.* at 7048; *see also* 49 C.F.R. § 383.71(b)(6), (f)(3)(iii). The Rule provides comparable assurances for non-domiciled drivers by limiting CDL eligibility to H-2A, H-2B, and E-2 visa holders who undergo a "combination of Federal [vetting] processes," the "totality" of which is reasonably equivalent to the screening required of domestic drivers. 91 Fed. Reg. at 7049-51.

Petitioner fails to show that this was an arbitrary line for FMCSA to draw. Mot. 18-20. The agency reasonably explained that holders of H-2A, H-2B, and E-2 visas are situated differently from the classes of aliens now excluded from eligibility. For those visa categories, "several factors … , in combination, provide reasonable assurance of driver fitness" despite States' inability to review driver history: "[l]abor [c]ertification and [e]mployer [s]creening," "[c]onsular [a]djudication," "[o]ngoing [e]mployment [r]elationship," and "[f]ederal [o]versight." 91 Fed. Reg. at 7050; *accord* Mot. 21. Petitioner misses the point when it faults FMCSA for acknowledging that these safeguards do not "perfectly replicate" those applicable to domestic drivers. Mot. 18 (quoting 91 Fed. Reg. at 7050). Given the fundamental constraints on States' ability to access foreign driving history, it was hardly arbitrary and capricious for the agency to adopt a practical

19

approach that "provides a reasonable functional equivalent." 91 Fed. Reg. at 7050.

Petitioner's specific attacks on FMCSA's judgment fare no better. At the outset, petitioner is simply incorrect that the agency did not consider whether States could review foreign driving records if they obtained them directly. Mot. 21. FMCSA explained that doing so would place a "substantial burden" on States, which—unlike "Federal agencies with the necessary experience"—generally will not possess "knowledge of how [foreign] traffic laws … compare to domestic [ones]." 91 Fed. Reg. at 7068. Petitioner's proposed workarounds (Mot. 21) would not address that deficiency.[1] And although petitioner questions whether consular officers in fact "request and review documentation related to driving history," Mot. 19 (quotation marks omitted), "[t]he Department of State has confirmed" exactly that, 91 Fed. Reg. at 7050, including "10 years of driving history," *id.* at 7060, matching the 10-year domestic driving history States must consult.

---

[1] That holders of non-domiciled CDLs are required to report foreign "adverse action" against their driving privileges, 49 C.F.R. § 383.71(f)(2)(ii), does not undermine that conclusion, Mot. 21. The regulation does not require States to evaluate the substantive foreign-law basis for the adverse action, and in any event adverse action, such as a suspension or revocation of driving privileges, does not capture all relevant driving history (such as offenses or penalties that do not result in a suspension or revocation).

20

Nor does petitioner advance its case by asserting (Mot. 20) that some employers vet drivers before hiring them; assuming that is true, many CDL holders operate independently with no employer vetting, and petitioner does not contend that *all* employers conduct vetting remotely comparable to the federal vetting that FMCSA describes.

### C.    FMCSA Reasonably Determined that Altering Documentation Requirements Would Aid State Compliance

Petitioner also repeats many of the arguments as the *Lujan* petitioners regarding the Rule's revisions to the documentation States can use to satisfy the regulations' longstanding requirement that CDL applicants demonstrate lawful presence.  Under the prior regulations, to confirm lawful presence, applicants could present either an unexpired EAD or an I-94 form and unexpired passport.  49 C.F.R. § 383.71(f)(2)(i) (2024); *see id.* § 383.73(f)(3) (2024).  As FMCSA explained, reviews of state compliance with the prior regulations revealed widespread issues among front-line licensing clerks in interpreting EADs that resulted in error rates in certain States as high as 53% of all non-domiciled CDLs issued.  *Supra* pp. 5-6.  Clerks struggled to interpret immigration codes used on EADs—including codes denoting DACA recipients as compared to other forms of deferred action—and routinely

issued or renewed CDLs using expired EADs in conjunction with other USCIS forms that indicated an applicant had sought (but not necessarily received) an EAD extension or renewal. 91 Fed. Reg. at 7052. States also commonly issued non-domiciled CDLs with expiration dates exceeding the applicant's authorized period of lawful presence. *Id.* at 7045, 7063.

Because of the widespread compliance issues attending the use of EADs, the Rule no longer accepts EADs to establish lawful presence. The Rule instead requires that States confirm lawful status using Form I-94/94A, which clearly identifies an applicant's visa category and the term for which she has been admitted to the United States, thus eliminating the need for clerks to decipher immigration codes. 91 Fed. Reg. at 7052-53, 7061, 7074, 7091. Replacing the prior "complex framework" with a "bright-line eligibility standard" is designed to "eliminate[] the burden on [State]s to interpret complex immigration codes" and improve consistency. *Id.* at 7045 (quotation marks omitted); *see id.* at 7052 (emphasizing FMCSA's "statutory mandate to prescribe uniform standards for the issuance of … CDLs"); *id.* at 7061 (noting "simplicity of the [I-94's] nonimmigrant status coding").

Petitioner misunderstands or mischaracterizes the Rule's effect. As discussed, FMCSA limited the categories of visa holders eligible for non-

22

domiciled CDLs because of concerns about vetting those applicants. Put otherwise, it was inaccessible driving history, not States' licensing deficiencies *per se*, that had a "relation to safety" requiring FMCSA's intervention. Mot. 22-23. The only group whose ineligibility under the Rule depends entirely on FMCSA's revised documentation requirements are DACA recipients.[2] As a threshold matter, as FMCSA explained, approximately 80% of DACA recipients are citizens of Mexico, who are categorically ineligible for non-domiciled CDLs. *See* 91 Fed. Reg. at 7055. FMCSA was well within its discretion to resume enforcing that longstanding regulatory prohibition. *See id.* And on the merits, FMCSA explained that DACA recipients generally lack I-94/94A forms, and thus would be unable to meet the documentation requirements. *Id.* FMCSA further explained that creating an exception to those requirements for DACA recipients would simply replicate the problems of administration States experienced with EADs, including confusion distinguishing between the EAD code for DACA and other forms of deferred action. *Id.* at 7055, 7069, 7099.

---

[2] Because DACA recipients are the only group excluded from eligibility solely based on the new documentation requirements, even if petitioner were likely to succeed on this issue, any relief should be correspondingly limited.

23

Petitioner does not dispute the reasonableness of either the longstanding requirement that States confirm lawful presence or the requirement that the validity period of a non-domiciled CDL should not exceed the authorized period of lawful status, and FMCSA is generally free to decide how States can best comply with those rules. Given that point, the salient question is whether FMCSA reasonably determined that States could more effectively implement that requirement by using I-94/94A forms and unexpired passports.

FMCSA's annual reviews provided ample support for that conclusion. *Contra* Mot. 22 (accusing FMCSA of failing to "connect this claimed non-compliance to data"). Those reviews "identified more than 30 States that failed to comply with the non-domiciled [CDL] regulations," 91 Fed. Reg. at 7051, resulting in "tens of thousands [of] non-domiciled CDLs" being issued contrary to federal law, *id.* at 7045. Just as troubling were the "staggering error rates" that FMCSA discovered in some states—including non-compliance rates of 25% for California, 49% for Texas, and 53% for New York. *Id.*

Petitioner contends that FMCSA acted arbitrarily in failing to consider various alternative interventions to address this problem. Mot. 22-24. But

24

revoking and reissuing CDLs previously issued contrary to existing regulations would not address States' ongoing failures to comply. Mot. 22-23. And the record supports FMCSA's conclusion that this pervasive non-compliance is "not merely a training deficiency," 91 Fed. Reg. at 7052, that can be solved by encouraging States to implement "best practices," Mot. 23. Rather, there have been "consistent failure[s] across more than 30 States." 91 Fed. Reg. at 7052. The Administrative Procedure Act does not require an agency to first try half-measures before altering a system with such widespread administrability problems.

## II. The Balance of Harms and Public Interest Also Preclude a Stay

A stay of the Rule would work significant harm to the government and the public. As a baseline matter, an order prohibiting the government from complying with its statutory mandate to ensure safe operation of commercial motor vehicles inflicts *per se* irreparable harm. *Trump v. CASA, Inc.*, 606 U.S. 831, 860-61 (2025). Furthermore, the Rule is designed to protect all highway users. Depriving them of the Rule's indirect protections also inflicts irreparable harm and disserves the public interest—not least because a stay might encourage the same surge in applications FMCSA sought to avoid by promulgating the IFR. *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 4 (2025)

25

(Kavanaugh, J., concurring) (noting that a court should also consider "harms to the third parties who otherwise would *benefit* from the challenged government action").

The broad-based and urgent harms of a stay far outweigh the harms petitioner has claimed. Petitioner claims that about 45 of its 2,600 bus drivers will be ineligible to renew their CDLs when the Rule takes effect, and speculates the Rule will mean fewer experienced CDL holders will be available for future hiring. Such allegations—implicating at most about 2% of petitioner's current driver workforce—cannot carry petitioner's burden of showing "certain and great" injury. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Moreover, the Rule is prospective only; individuals currently holding CDLs may operate until their CDLs expire, such that "[m]ost individuals … ineligible for renewal will … have a transition period from when [the] rule becomes effective until the date of the CDL's expiration." 91 Fed. Reg. at 7083-84. Petitioner offers no evidence that all, or even most, of its non-domiciled drivers are facing imminent expiration of their licenses.

**CONCLUSION**

For the foregoing reasons, the Court should deny the motion for stay pending review.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
SIMON G. JEROME

 */s/ Gabriel I. Schonfeld*
GABRIEL I. SCHONFELD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7219*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3306*
  *gabriel.i.schonfeld@usdoj.gov*

MARCH 2026

27

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing response complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the response contains 5,176 words.  The response complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point CenturyExpd BT typeface.

*/s/ Gabriel I. Schonfeld*
Gabriel I. Schonfeld