ORAL ARGUMENT NOT YET SCHEDULED
No. 26-1046
(consolidated with 26-1032)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MARTIN LUTHER KING, JR. COUNTY,

Petitioner,

v.

SEAN DUFFY IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE U.S. DEPARTMENT OF TRANSPORTATION; THE U.S.
DEPARTMENT OF TRANSPORTATION; THE FEDERAL MOTOR
CARRIER SAFETY ADMINISTRATION; THE UNITED STATES,

Respondents.

**On Petition for Review of a Final Rule of the Federal Motor
Carrier Safety Administration**

**OPENING BRIEF FOR PETITIONER**

Paul J. Lawrence
Kevin J. Kennedy
Eugene Lee
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
(206) 240-1700

*Counsel for Petitioner*

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), and Federal Rule of Appellate Procedure 26.1, the undersigned counsel certifies as follows:

## A. Parties and Amici

Petitioner is Martin Luther King, Jr. County.  Respondents are Sean Duffy, in his official capacity as Secretary of the Department of Transportation; the Department of Transportation; the Federal Motor Carrier Safety Administration; and the United States.

The parties in the consolidated case, No. 26-1032, are petitioners Jorge Rivera Lujan; Aleksei Semenovskii; American Federation of State, County & Municipal Employees, AFL-CIO; and American Federation of Teachers, AFL-CIO, and respondents the Federal Motor Carrier Safety Administration, the United States Department of Transportation, and the United States.

No amici have entered appearances in this case. In the consolidated case No. 26-1032, City of Albany, New York; City of Albuquerque, New Mexico; City of Cambridge, Massachusetts; Montgomery County, Maryland; City of New Haven, Connecticut; City of New York, New York; City of Portland, Oregon; City and County of

i

San Francisco, California; County of Santa Clara, California; City of

Seattle, Washington; Celina Benitez, Mayor, City of Mount Rainier,

Maryland; Jesse Brown, Councilmember, City of Indianapolis, Indiana;

Chelsea Byers, Mayor, City of West Hollywood, California; Chris

Canales, Councilmember, City of El Paso, Texas; Michael Chameides,

Supervisor, County of Columbia, New York; John Clark, Mayor, Town

of Ridgway, Colorado; Alison Coombs, Mayor Pro Tempore and

Councilmember, City of Aurora, Colorado; Christine Corrado,

Councilmember, Township of Brighton, New York; Nikki Fortunato

Bas, Supervisor, Alameda County, California; Brenda Gadd,

Councilmember, Metropolitan Nashville and Davidson County,

Tennessee; Caroline Torosis, Mayor Pro Tempore, City of Santa Monica,

California; Terry Vo, Councilmember, Metropolitan Nashville and

Davidson County, Tennessee; Ginny Welsch, Councilmember,

Metropolitan Nashville and Davidson County, Tennessee; Robin Wilt,

Councilmember, Township of Brighton, New York; Asylum Seeker

Advocacy Project; National Immigration Law Center; National

Employment Law Project; Teamsters California; Waste Pro USA; Sikh

ii

Coalition; California Sikh Youth Alliance; Sikh American Legal Defense and Education Fund; the Jakara Movement; and United Sikhs.

As of this filing, there are no amici supporting respondents.

**B. Rulings under Review**

Petitioner seeks review of the Federal Motor Carrier Safety Administration's final rule entitled "Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)" (Docket No. FMCSA–2025–0622) and published in the Federal Register on February, 13, 2026 at 91 Fed. Reg. 7044.

**C. Related Cases**

This case has not previously been before this Court or any other appellate court. This case has been consolidated with *Jorge Lujan, et al v. FMCSA, et al*, No. 26-1032, another case involving a petition for review concerning the same final rule. In addition, No. 25-1215, which is consolidated with No. 25-1224 and is currently being held in abeyance, involves the same parties and some similar issues, with respect to an interim final rule that preceded the final rule at issue in

this case. Undersigned counsel is unaware of any other related cases

pending in this Court or any other court.

*/s/ Paul J. Lawrence*

Paul J. Lawrence

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ...................................................... 3

STATUTES AND REGULATIONS ...................................................... 4

STATEMENT OF THE ISSUES .......................................................... 4

STATEMENT OF THE CASE .............................................................. 4

I.     Legal and Factual Background. ................................................. 4

    A.  Statutory And Regulatory Background. ............................. 4

    B.  The Trump Administration Targets Non-Domiciled CDLs Issued to Noncitizens. ............................................................. 8

    C.  FMCSA Issues an Interim Final Rule Restricting Eligibility for Non-Domiciled CDLs. ..................................................... 10

    D.  This Court Stays the Interim Final Rule. ....................... 11

    E.  The Trump Administration Continues to Target Non-Domiciled CDLs and Deems H-2A and H-2B Visa Programs Essential. ....... 13

    F.  FMCSA Issues the Final Rule. ....................................... 17

    G.  This Court Declines to Stay the Final Rule. ................... 18

    H.  The Final Rule Disrupts Petitioner's Transit Services. ... 19

SUMMARY OF ARGUMENT ............................................................ 20

ARGUMENT ..................................................................................... 23

I.     King County has Article III Standing. ................................... 23

II.    The Final Rule Exceeds FMCSA's Statutory Authority. ........ 25

A.  FMCSA's Cited Statutory Provisions Do Not Authorize the Rule ................................................................................. 26

B.  Legislative History, Statutory Context, and Regulatory History Confirm that FMCSA's Rule Exceeds Its Statutory Authority ..... 36

III.  The Final Rule is Arbitrary and Capricious Because It Does Not Reflect Reasoned Decision-Making. ................................................. 43

IV.  The Final Rule is Arbitrary and Capricious Because It Is Based on a Pretextual Explanation. ............................................................. 43

CONCLUSION ..................................................................................... 51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Federal Cases**

*Air All. Houston v. Env't Prot. Agency,*
  906 F.3d 1049 (D.C. Cir. 2018) .......................................................... 41

*Arizona v. United States,*
  567 U.S. 387 (2012) ........................................................................... 36

*California v. Mullin,*
  No. 25-13829, 2026 WL 1649160 (D. Mass. June 8, 2026) ........... 15, 48

*Carpenters Indus. Council v. Zinke,*
  854 F.3d 1 (D.C. Cir. 2017) ........................................................... 23, 24

*Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n,*
  466 F.3d 134 (D.C. Cir. 2006) ............................................................ 26

*Czyzewski v. Jevic Holding Corp.,*
  580 U.S. 451 (2017) ........................................................................... 23

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ............................................................... 43, 44, 45

*Dorcas Int'l Inst. of Rhode Island v. U.S. Citizenship & Immigr. Servs.,*
  No. 26-cv-132, 2026 WL 1622708 (D.R.I. June 5, 2026) .............. 15, 48

*Epic Sys. Corp. v. Lewis,*
  584 U.S. 497 (2018) ........................................................................... 36

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ........................................................................... 30

*Florida v. California,*
  146 S. Ct. 1290 (2026) ....................................................................... 10

*Food Mktg. Inst. v. I. C. C.,*
  587 F.2d 1285 (D.C. Cir. 1978) .......................................................... 44

*Gonzales v. Oregon,*
  546 U.S. 243 (2006) ....................................................................... 32, 33

*Harrington v. Purdue Pharma L. P.*,
   603 U.S. 204 (2024)...................................................................28, 30

*Lujan v. Fed. Motor Carrier Safety Admin.*,
   No. 25-1215 (consolidated with No. 25-1224), 2025 WL 3182504 (D.C.
   Cir. Nov. 13, 2025) .................................................... 12, 13, 46

*McDonnell v. United States*,
   579 U.S. 550 (2016)...............................................................28

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..................................................................43

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health
   Admin.*,
   595 U.S. 109 (2022).................................................................44

*Nat'l TPS All. v. Noem*,
   166 F.4th 739 (9th Cir. 2026) .................................................48

*Nat'l TPS All. v. Noem*,
   169 F.4th 796 (9th Cir. 2026) (Mendoza, J., concurring in the denial of
   rehearing *en banc*) .................................................................48

*Nat'l Treasury Emps. Union v. Horner*,
   854 F.2d 490 (D.C. Cir. 1988) ................................................51

*New York Stock Exch. LLC v. Sec. & Exch. Comm'n*,
   962 F.3d 541 (D.C. Cir. 2020) ................................................30

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
   489 F.3d 1279 (D.C. Cir. 2007) ...............................................24

*Tozzi v. U.S. Dep't of Health & Hum. Servs.*,
   271 F.3d 301 (D.C. Cir. 2001) .................................................44

*United Farm Workers v. U.S. Dep't of Lab.*,
   No. 1:25-cv-1614, 2026 WL 1345918 (E.D. Cal. May 14, 2026)..........16

*United States v. Bowser*,
   964 F.3d 26 (D.C. Cir. 2020) ..................................................35

## Federal Statutes

23 U.S.C. § 158 ...................................................................................31

28 U.S.C. § 2342(3)(A) .......................................................................4

49 U.S.C. § 113(b) .........................................................................1, 25

49 U.S.C. § 31136 .........................................................................1, 25

49 U.S.C. § 31301 .................................................................3, 4, 5, 6

49 U.S.C. § 31302 .......................................................................5, 6, 38

49 U.S.C. § 31305 ................................................... 5, 6, 20, 26, 27, 28

49 U.S.C. § 31306 .........................................................................5, 35

49 U.S.C. § 31308 .......................................... 5, 6, 20, 26, 28, 29, 34, 37

49 U.S.C. § 31311 .............................................6, 20, 26, 31, 33, 34, 38, 42

Commercial Motor Vehicle Safety Act
Pub. L. No. 99-570, 100 Stat. 3207–170 (1986) .................................6, 38

SAFE Port Act of 2006  Pub. L. No. 109-347,
120 Stat. 1884, 1944 (49 U.S.C. § 31100 note) ...........................7, 40, 41

## Federal Regulations

49 C.F.R. § 383.71(f) .......................................................................7, 8, 11

49 C.F.R. § 383.73(b) ...........................................................................33

49 C.F.R. § 391.11(b)(1) ........................................................................31

*Adverse Effect Wage Rate Methodology for the Temporary Employment
of H-2A Nonimmigrants in Non-Range Occupations in the Unite*d
States, 90 Fed. Reg. 47914 (Oct. 2, 2025)....................................16, 47

*Commercial Driver Testing and Licensing Standards,*
 53 Fed. Reg. 27628 (July 21, 1988)...................................................6, 39

*Commercial Driver's License Testing and Commercial Learner's Permit
 Standards*, 76 Fed. Reg. 26854 (May 9, 2011) ...................................32

*Exercise of Time-Limited Authority to Increase the Fiscal Year 2026
 Numerical Limitation for the H-2B Temporary Nonagricultural
 Worker Program,* 91 Fed. Reg. 5040 (Feb. 3, 2026)................. 16, 17, 50

*Restoring Integrity to the Issuance of Non-Domiciled Commercial
 Drivers Licenses (CDL),*
 90 Fed. Reg. 46509 (Sep. 29, 2025).............................. 10, 11, 13, 47, 50

*Restoring Integrity to the Issuance of Non-Domiciled Commercial
 Drivers Licenses (CDL),*
 91 Fed. Reg. 7044  (Feb. 13, 2026)........1, 4, 7, 17, 18, 26, 28, 45, 46, 47

## Other Authorities

Executive Order 14159, *Protecting the American People Against
 Invasion*, 90 Fed. Reg. 8443 (Jan. 29, 2025) .........................................8

Executive Order 14286, *Enforcing Commonsense Rules of the Road for
 America's Truck Drivers,* 90 Fed. Reg.18759 (May 2, 2025) .................8

32 Cong. Rec. S16919 (daily ed. Oct. 17, 1986).....................................37

H.R. 5688, 119th Cong. (2025) ...............................................................42

Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant
 Workers*, 90 Fed. Reg. 46027 (Sep. 24, 2025) .....................................15

S. Rep. No. 99-411 (1986) ...........................................................6, 37, 38

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CDL | Commercial Driver's License |
| CMV | Commercial Motor Vehicle |
| CMVSA | Commercial Motor Vehicle Safety Act |
| DACA | Deferred Action for Childhood Arrivals |
| DHS | Department of Homeland Security |
| DOL | Department of Labor |
| DOT | Department of Transportation |
| EAD | Employment Authorization Document |
| EO | Executive Order |
| FMCSA | Federal Motor Carrier Safety Administration |
| IFR | Interim Final Rule |

**INTRODUCTION**

Congress charged the Federal Motor Carrier Safety Administration (FMCSA) with furthering "the highest degree of safety in motor carrier transportation." 49 U.S.C. § 113(b). Consistent with that charge, Congress provided FMCSA with narrowly prescribed rulemaking authority to establish safety and licensing standards for issuing commercial driver's licenses (CDLs).

FMCSA's Final Rule, *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, (the Rule) does no such thing. 91 Fed. Reg. 7044 (Feb. 13, 2026). It does not set a safety standard or specify information that a driver must submit before obtaining a CDL. Rather, the Rule restricts noncitizens' eligibility for CDLs to those with specific visas. *Id.* at 7044–45. It broadly prohibits all other lawfully present noncitizens—asylum seekers, asylees, refugees, and Deferred Action for Childhood Arrivals (DACA) recipients—from obtaining CDLs even though they are eligible to remain and work in the United States. By its own estimate, the Rule renders ineligible 97% of noncitizens who currently hold a CDL. *Id.* at 7095–96. The Rule disrupts not only the lives of these noncitizens who

1

rely on jobs that require CDLs, but also the services provided by their employers.

The Rule is unlawful and must be vacated. FMCSA claims that the Rule enhances "safety" because, in the agency's view, it cannot adequately vet the driving histories of the now-ineligible categories of noncitizens. Even if FMCSA's asserted safety rationale were well supported (it is not), the Rule exceeds FMCSA's statutory authority. Congress has tasked FMCSA with measuring individual applicants' fitness to drive a commercial motor vehicle—it has not authorized FMCSA to render entire categories of persons ineligible on the basis of a population-level proxy for safety. If FMCSA were correct, the agency could limit eligibility for CDLs to persons from particular ZIP codes because those people tend to be safer drivers. That is not the scheme that Congress envisioned, or the one it enacted. FMCSA's proxy is particularly suspect because it hinges on immigration status. The statutory provisions that FMCSA administers do not touch on immigration or work authorization. And FMCSA certainly has no authority over those areas, which are governed by a separate statutory scheme and delegated to different federal agencies.

2

The Rule must also be vacated for lack of reasoned decision-making. The safety concerns identified in the Rule are a textbook example of an arbitrary and capricious rationale. The agency *admits* that it lacks evidence that the people excluded by the Rule drive any less safely than those who remain eligible. *See id.* at 7065. And while FMCSA claims that the Rule will keep drivers with unknown foreign driving histories off the roads, that rationale does not withstand scrutiny. Indeed, it cannot be squared with FMCSA's exclusion of DACA recipients, who have exclusively domestic driving histories.

Why did the agency create such a broad, sweeping eligibility rule based on such slim evidence of safety benefits? Because FMCSA's Rule is fundamentally concerned with and motivated by immigration policy. Safety is a mere pretext to further the current Administration's anti-immigrant agenda. Because the explanation offered is not the true explanation for the Rule, it must be vacated as arbitrary and capricious.

## JURISDICTIONAL STATEMENT

FMCSA issued the challenged rule on February 11, 2026, under the Commercial Motor Vehicle Safety Act of 1986, 49 U.S.C. § 31301, et seq., and published it in the Federal Register on February 13, 2026.

FMCSA, Final Rule, *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)*, 91 Fed. Reg. 7044 (Feb. 13, 2026). Petitioner filed a timely petition for review of the Rule on March 4, 2026. This Court has jurisdiction under 28 U.S.C. § 2342(3)(A).

## STATUTES AND REGULATIONS

The relevant statutory and regulatory provisions are included in the Addendum or in the Addendum filed by Petitioners in 26-1032.

## STATEMENT OF THE ISSUES

1) Whether the Rule is contrary to law because it exceeds FMCSA's statutory authority?

2) Whether the Rule is arbitrary and capricious because it is based on lack of reasoned decision-making and a pretextual rationale?

## STATEMENT OF THE CASE

### I. Legal and Factual Background

### A. Statutory And Regulatory Background.

In 1986, Congress enacted the Commercial Motor Vehicle Safety Act (CMVSA) to impose stricter requirements on the use of large vehicles like buses and trucks, which are known as "commercial motor vehicles" (CMVs). 49 U.S.C. §§ 31301–02. Under the CMVSA, as

4

amended, a driver of a CMV is required to obtain a CDL, *id.* § 31302, and to notify their employers of any driving violations, *id.* § 31303(a). A driver is also subject to pre-employment and random drug testing as well as medical evaluations. *Id.* §§ 31306(b)(1)(A); 31136(a)(3).

CDLs are issued by States, *see id.* § 31301(3), in accordance with standards set by the federal government. Specifically, the CMVSA directs FMCSA to "prescribe regulations on minimum standards for testing and ensuring the fitness of" commercial vehicle drivers and for the "issuance of commercial drivers' licenses and learner's permits by the States." *Id.* §§ 31305(a), 31308. Under Section 31305(a), FMCSA is tasked with a number of discrete safety objectives, such as ensuring that a driver of the vehicle has knowledge of the "safety systems of the vehicle" and setting "minimum scores for passing the tests." *Id.* § 31305(a)(4), (6). These standards ensure that the drivers operating CMVs have the knowledge, skills, and training necessary to operate those vehicles safely. FMCSA, in consultation with the States, is also tasked with setting "minimum uniform standards for the issuance" of CDLs by the States. *Id.* § 31308. FMCSA's regulations ensure that States issue CDLs only to drivers who meet FMCSA's safety standards.

5

Generally, States may issue CDLs only to their domicilaries. *Id.* § 31311(a)(12)(A). Congress created this requirement as part of a solution to a specific problem: that a minority of commercial drivers possessed multiple state-issued licenses. S. Rep. No. 99-411, at 3 (1986). Under the old system, unsafe drivers could "spread their traffic violations over a number of licenses, and maintain a 'good driver' rating regardless of the number of violations." *Id.* To solve that problem, the CMVSA required that "no person who operates a commercial motor vehicle shall at any time have more than one driver's license." Pub. L. No. 99-570, tit. XII, § 12002, 100 Stat. 3207–170 (1986) (codified as amended at 49 U.S.C. § 31302).

States, however, may also issue CDLs to persons domiciled outside of the jurisdiction under regulations prescribed by FMCSA. 49 U.S.C. §§ 31305(a), 31308, 31311(a)(12)(B)(ii). These CDLs are referred to as "non-domiciled CDLs."[1] And noncitizens, like other non-domicilaries, are permitted to drive a CMV by obtaining a CDL. 49 U.S.C. § 31301(10) (defining "foreign commercial driver" as "an

---

[1] A previous version of the regulations referred to these CDLs as "Nonresident CDLs." *Commercial Driver Testing and Licensing Standards,* 53 Fed. Reg. 27628, 27648–49 (July 21, 1988).

individual licensed to operate a commercial motor vehicle by an authority outside the United States, or a citizen of a foreign country who operates a commercial motor vehicle in the United States").

FMCSA has—up until now—regulated the issuance of non-domiciled CDLs consistent with the CMVSA, as well as Congress's specific instruction to require proof of lawful presence in the United States. *See* Pub. L. No. 109-347, § 703(a), 120 Stat. 1884, 1944 (2006). Under previous regulations prescribed by FMCSA, a noncitizen could obtain a non-domiciled CDL if they provided: (1) a government issued unexpired employment authorization document (EAD)[2]; or (2) an unexpired foreign passport and an approved I-94 form regarding their most recent admittance to the United States. 91 Fed. Reg. at 7045. And, consistent with the CMVSA's scheme of individualized vetting and uniform state standards, FMCSA's regulations have required that non-domiciled CDL holders meet the same knowledge, skills, and training requirements as other CDL holders, 49 C.F.R. § 383.71(f)(2)(i), and that

---

[2] The EAD is a work permit available to immigrants who are not lawful permanent residents. *Employment Authorization Document*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://www.uscis.gov/green-card/green-card-processes-and-procedures/employment-authorization-document.

they report violations that occur in foreign jurisdictions, *id.* § 383.71(f)(2)(ii). Thus, noncitizens of lawful status or those lawfully present in the United States[3] could obtain non-domiciled CDLs by demonstrating their fitness to drive a CMV. That has changed under the Rule.

### B.    The Trump Administration Targets Non-Domiciled CDLs Issued to Noncitizens.

The Rule arises out of the Trump Administration's efforts to address immigration. The day President Trump took office, he issued Executive Order (EO) 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 29, 2025). It begins, "Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States," and emphasizes that noncitizens who entered the country unlawfully are "committing vile and heinous acts against innocent Americans." *Id.*

But the Administration has not limited its efforts to addressing undocumented immigrants. Instead, it has raised concerns that all noncitizens—regardless of legal status—pose a threat to public safety.

---

[3] For simplicity, we refer to immigration status and lawful presence together as "immigration status."

On April 28, 2025, President Trump issued EO 14286, *Enforcing Commonsense Rules of the Road for America's Truck Drivers* (the Truck EO) which asserts that "America's roadways have become less safe" because there are drivers who are not proficient in English. 90 Fed. Reg. 18759 (May 2, 2025). The Truck EO explains that although there is a federal requirement that drivers of CMVs must be proficient in English, that requirement has been underenforced. *Id.* To improve safety, the Truck EO directs FMCSA to review States' issuance of CDLs to noncitizens for "irregularities." *Id.* at 18759–60.

On August 18, 2025, the U.S. Department of Homeland Security (DHS) released a press release about a fatal crash involving Harjinder Singh, a non-domiciled CDL holder.[4] The next day, DOT issued a statement about the crash, stating that "[n]on-enforcement and radical immigration policies have turned the trucking industry into a lawless frontier" and that "FMCSA's investigation will support the state's

---

[4] *Criminal Illegal Alien Recklessly Driving an 18-Wheeler Kills Three in* Florida, U.S. Dep't Homeland Sec. (Aug. 18, 2025), https://www.dhs.gov/news/2025/08/18/criminal-illegal-alien-recklessly-driving-18-wheeler-kills-three-florida.

ongoing criminal investigation."[5] DHS again posted on social media about Singh, stating that it "will work with [DOT] to root out and prevent illegal aliens from obtaining these licenses from sanctuary jurisdictions that put American drivers and passengers in danger."[6] But in a separate litigation concerning the accident, California has insisted that it issued Singh a non-domiciled CDL "only after complying with federal and state regulations."[7]

## C.    FMCSA Issues an Interim Final Rule Restricting Eligibility for Non-Domiciled CDLs.

In September, the following month, FMCSA issued an interim final rule (IFR) titled *Restoring Integrity to the Issuance of Non-Domiciled Commercial Drivers Licenses (CDL)* without notice-and-comment or consultation with the States. 90 Fed. Reg. 46509, 46514–15,

---

[5] *Trump's Transportation Secretary Announces Investigation into Deadly Florida Truck Crash, Shares Preliminary Findings*, U.S. DEP'T TRANSP. (Aug. 19, 2025), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-announces-investigation-deadly-florida-truck-crash.

[6] Homeland Security (@DHSgov), X (Aug. 20, 2025, at 6:20 AM), https://x.com/DHSgov/status/1958157078503030915.

[7] State of California's Brief in Opposition at 7, *Florida v. California*, 146 S. Ct. 1290 (2026) (No. 162), *available at* https://www.supremecourt.gov/DocketPDF/22/22O162/392843/20260127 180516184_Florida%20v.%20California%20BIO%20Final%20PDFA.pdf.

46523 (Sep. 29, 2025). FMCSA justified bypassing these procedural requirements by declaring that there was an "imminent hazard to public safety and a direct threat to national security." *Id.* at 46513–14. The IFR cited five crashes in 2025 involving non-domiciled CDL holders, the most recent of which was the crash involving Singh. *See id.* at 46512–13 & n.10. FMCSA conceded that these five crashes were not "sufficient evidence . . . to reliably demonstrate a measurable empirical relationship between the nation of domicile for a CDL diver and safety outcomes." *Id.* at 46520. It nonetheless sought to address the purported road safety issue by restricting eligibility for non-domiciled CDLs only to limited categories of noncitizens who have H-2A, H-2B, and E-2 visas. 49 C.F.R. § 383.71(f)(3)(i) (citing *id.* § 383.5). The IFR excluded, among others, asylum seekers, asylees, refugees, and DACA recipients, who are lawfully present and eligible for employment in the United States. 90 Fed. Reg. at 46515.

D.      **This Court Stays the Interim Final Rule.**

On October 24, 2025, Petitioner King County moved for an emergency stay of the IFR, which was consolidated with another motion

11

filed by other Petitioners.[8] A panel of this Court granted the motions and stayed the IFR, with a dissent by Judge Henderson. *Lujan v. Fed. Motor Carrier Safety Admin.*, No. 25-1215 (consolidated with No. 25-1224), 2025 WL 3182504 (D.C. Cir. Nov. 13, 2025) (per curiam). The Court held that petitioners were likely to succeed in their procedural challenges regarding lack of notice-and-comment and consultation with the States, and that the IFR was arbitrary and capricious. *Id.* at *1–2. It explained that "FMCSA's own data appears to indicate that the CDL holders excluded by the rule are involved in fatal crashes at a lower rate than CDL holders who are not excluded," because "according to the FMCSA's own data, non-domiciled CDL holders account for approximately 5 percent of all CDL holders but only about 0.2 percent of fatal crashes." *Id.* at *2. And considering "FMCSA's anticipation that less-experienced drivers would replace the non-domiciled ones forced out of the market, it [did] not appear to have shown that the rule would produce any net safety benefit." *Id.* Thus, FMSCA did not "appear to

---

[8] Petition filed by Jorge Rivera Lujan, Aleksei Semenovskii, American Federation of State, County & Municipal Employees, AFL-CIO (AFSCME), and American Federation of Teachers, AFL-CIO (AFT), No. 25-1215.

12

have articulated a satisfactory explanation for how the rule would promote safety." *Id.* (cleaned up).[9]

FMCSA continued to accept comments on the IFR until November 28, 2025. 90 Fed. Reg. at 46515.

### E.  The Trump Administration Continues to Target Non-Domiciled CDLs and Deems H-2A and H-2B Visa Programs Essential.

After issuing the IFR, the Trump Administration began targeting non-domiciled CDL holders in its immigration enforcement efforts. Since the IFR was issued, there have been at least five immigration enforcement efforts targeting non-domiciled CDL holders: an October 2025 enforcement effort in Oklahoma,[10] Operation Midway Blitz in Indiana,[11] Operation Guardian in Oklahoma,[12] Operation Highway

---

[9] The consolidated cases challenging the IFR are in abeyance. Order, No. 25-1215 (Feb. 20, 2026).

[10] *ICYMI: ICE and Oklahoma Highway Patrol Arrests 91 Illegal Aliens Driving 18-Wheelers on Highways in Successful Three Day Action on I-40*, U.S. DEP'T HOMELAND SEC. (Oct. 6, 2025), https://www.dhs.gov/news/2025/10/06/icymi-ice-and-oklahoma-highway-patrol-arrests-91-illegal-aliens-driving-18-wheelers.

[11] *Secretary Noem Highlights More than 140 Illegal Alien Truck Drivers Arrested During Operation Midway Blitz*, U.S. DEP'T HOMELAND SEC. (Oct. 30, 2025), https://www.dhs.gov/news/2025/10/30/secretary-noem-highlights-more-140-illegal-alien-truck-drivers-arrested-during.

[12] *ICE and Oklahoma Bolster Public Safety on State's Highways by Removing 34 Illegal Alien Truck Drivers*, U.S. IMMIGR. & CUSTOMS ENF'T

13

Sentinel in California,[13] and Operation Checkmate (nationwide).[14] DHS

has released at least five press releases about crashes involving non-

domiciled CDL holders.[15] And both DOT and DHS have endorsed

proposed legislation that would restrict non-domiciled CDL eligibility.[16]

---

(Nov. 4, 2025), https://www.ice.gov/news/releases/ice-and-oklahoma-bolster-public-safety-states-highways-removing-34-illegal-alien.

[13] *ICE Operation Highway Sentinel Arrests over 100 Illegal Alien Truck Drivers in Gavin Newsom's California*, U.S. IMMIGR. & CUSTOMS ENF'T (Dec. 23, 2025), https://www.ice.gov/news/releases/ice-operation-highway-sentinel-arrests-over-100-illegal-alien-truck-drivers-gavin.

[14] *Operation Checkmate Results in 52 Arrests, Including 36 Commercial Truck Drivers*, U.S. CUSTOMS & BORDER PROT. (June 1, 2026), https://www.cbp.gov/newsroom/national-media-release/operation-checkmate-results-52-arrests-including-36-commercial.

[15] *ICE Asks Governor Gavin Newsom and California Sanctuary Politicians to Not Release Illegal Alien Truck Driver Who Killed Two People in Crash*, U.S. DEP'T HOMELAND SEC. (May 21, 2026), https://www.dhs.gov/news/2026/05/21/ice-asks-governor-gavin-newsom-and-california-sanctuary-politicians-not-release (summarizing five crashes); *see also ICE Arrests Uzbekistan Criminal Illegal Alien and Wanted Terrorist Driving 18-Wheeler in Kansas*, U.S. DEP'T HOMELAND SEC. (Nov. 17, 2025), https://www.dhs.gov/news/2025/11/17/ice-arrests-uzbekistan-criminal-illegal-alien-and-wanted-terrorist-driving-18 (detailing arrest of a commercial truck driver on grounds that he is a member of a terrorist organization).

[16] *Trump's Transportation Secretary Sean P. Duffy Applauds President's Historic State of the Union Speech*, U.S. DEP'T TRANSP. (Feb. 24, 2026), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-applauds-presidents-historic-state-union ("A critical part of this work includes passing Dalilah's Law without delay."); *Secretary Noem Backs Dalilah Law to Bar States from Granting Commercial Driver's Licenses to Illegal Aliens following President Trump's Proposal at State of the Union*, U.S. DEP'T HOMELAND

These efforts have been consistent with the Administration's broader immigration agenda, which has dramatically altered existing immigration policies by suggesting that they are being undermined by illegal activity. For example, ten days before issuing the IFR, President Trump signed Proclamation 10973, *Restriction on Entry of Certain Nonimmigrant Workers*, which pointed out "systemic abuse of the [H-1B] program" and added a $100,000 supplemental payment for employers to submit new H-1B petitions. 90 Fed. Reg. 46027 (Sep. 24, 2025). A court recently vacated this Proclamation and the policies implementing it as ultra vires and in violation of the APA. *See California v. Mullin*, No. 25-13829, 2026 WL 1649160, at *12, 15–17, 20 (D. Mass. June 8, 2026); *see also e.g.*, *Dorcas Int'l Inst. of Rhode Island v. U.S. Citizenship & Immigr. Servs.*, No. 26-cv-132, 2026 WL 1622708, at *1, 6–7, 54 (D.R.I. June 5, 2026) (vacating a pause on pending immigration benefit requests by applicants "from thirty-nine African, Asian, Latin American, and Middle Eastern countries").

---

SEC. (Feb. 25, 2026), https://www.dhs.gov/news/2026/02/25/secretary-noem-backs-dalilah-law-bar-states-granting-commercial-drivers-licenses.

The Administration has looked more favorably on the H-2A and H-2B visa programs. Although it has lowered H-2A wages and offered only a limited number of additional H-2B visas, it has generally retained these programs because of concerns that they are vital to the economy. Just three days after issuance of the IFR, the U.S. Department of Labor (DOL) issued a different IFR that lowered H-2A workers' wages. *See United Farm Workers v. U.S. Dep't of Lab.*, No. 1:25-cv-1614, 2026 WL 1345918, at *3 (E.D. Cal. May 14, 2026) (citing *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 90 Fed. Reg. 47914, 47927–28 (Oct. 2, 2025)). DOL explained that "the agricultural sector is experiencing acute labor shortages and instability because it has long depended on a workforce with a high proportion of illegal aliens" who can no longer be relied on as a labor source "because of the now secure U.S. Southern Border." 90 Fed. Reg. at 47922.

A few months later, DHS and DOL issued additional H-2B visas for one fiscal year. *Exercise of Time-Limited Authority to Increase the Fiscal Year 2026 Numerical Limitation for the H-2B Temporary*

16

*Nonagricultural Worker Program*, 91 Fed. Reg. 5040 (Feb. 3, 2026). But these visas were made available "only to those American businesses that are suffering or will suffer impending irreparable harm." *Id.* at 5040.

### F.    FMCSA Issues the Final Rule.

On February 11, 2026, FMCSA issued the Rule, which has the same title as and is substantively identical to the IFR. 91 Fed. Reg. at 7091–92. DOT announced that the Rule addresses "a surge of deadly crashes involving non-domiciled drivers last summer."[17] But the Rule acknowledges that no data supports its restrictions because "the necessary level of detail regarding the type of CDL a driver involved in a crash held is simply not available under current crash reporting requirements." 91 Fed. Reg. at 7065. Although FMCSA points to 17 crashes involving noncitizens "for illustrative purposes," it explains that the Rule is not justified by a "specific crash count." *Id.*

---

[17] *Trump's Transportation Secretary Sean P. Duffy Puts Safety First, Finalizes Rule to Stop Unqualified Foreign Drivers from Driving Big Rigs on American Roadways*, U.S. DEP'T TRANSP. (Feb. 11, 2026), https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-puts-safety-first-finalizes-rule-stop.

17

Rather, FMCSA asserts that narrowing non-domiciled CDL eligibility addresses a two-pronged "safety gap" under the current regulations. *Id.* at 7044. First, FMCSA points to "the issuance of licenses to individuals whose safety fitness cannot be adequately verified by [States]." *Id.* Second, FMCSA identifies that "reliance on [EADs] to demonstrate eligibility for a non-domiciled CDL, . . . has proven administratively unworkable and resulted in widespread regulatory noncompliance." *Id.*

### G.     This Court Declines to Stay the Final Rule.

On March 4, 2026, King County filed a petition for review of the Rule and subsequently moved for an emergency stay. This case is consolidated with another case filed by the same Petitioners who moved to stay the IFR (and similarly moved to stay the Rule).[18] A panel of this Court denied the motions, with Judge Wilkins voting to grant the motions to stay. Order (May 5, 2026). The Court concluded that FMCSA likely had statutory authority to issue the Rule. *Id.* (Statement of Judge

---

[18] Petition filed by Jorge Rivera Lujan, Aleksei Semenovskii, American Federation of State, County & Municipal Employees, AFL-CIO (AFSCME), and American Federation of Teachers, AFL-CIO (AFT), No. 26-1032.

18

Katsas at 5–6).  It also concluded that the Rule was unlikely arbitrary and capricious because, in light of the agency's revised explanation, it did not appear to "brand[] foreign drivers as uniquely dangerous." *Id.* at 6. Instead, the Court explained that it appears "to ensure that [the vetting of noncitizens] is no less rigorous than that of drivers domiciled in the United States." *Id.*

## H.    The Final Rule Disrupts Petitioner's Transit Services.

King County has a population of about 2,411,700 and operates transit services (Metro) with an estimated ridership of 302,900 riders per weekday. Mot. for Stay, No. 26-1046 (Mar. 6, 2026), Addendum 1, Declaration of David Eldred (Eldred Declaration) ¶¶ 8–9. Metro employs about 50 bus operators and 50 related employees (e.g., mechanics and supervisors) who require non-domiciled CDLs, but are now ineligible under the Rule. *Id.* ¶ 23. The number of bus operators is not static; to account for the expansion of services and employee turnover, Metro continually recruits, hires, and trains new drivers. *Id.* ¶ 22. The Rule disrupts Metro's ability to retain enough bus operators to meet the needs of its communities. *Id.* ¶¶ 22–23. The Rule has caused Metro to incur unbudgeted costs in hiring new bus operators and

19

exposed the public to an immediate, rather than gradual, transition to less experienced drivers who pose well-documented safety risks. *Id.* ¶¶ 30–33.

## SUMMARY OF ARGUMENT

The Rule categorically bars almost all noncitizens with work permits—DACA recipients, asylum seekers, asylees, refugees, people with Temporary Protected Status, and others who are lawfully authorized to work in the United States—from holding non-domiciled CDLs. The Rule is unlawful for several reasons.

First, the Rule exceeds FMCSA's statutory authority. FMCSA does not have broad, general rulemaking authority. Rather, Congress has provided several discrete grants of rulemaking authority to the agency, and none of these limited delegations authorize the Rule. Under 49 U.S.C § 31305(a), FMCSA is directed to "prescribe regulations on minimum standards for testing and ensuring the fitness of an *individual* operating a commercial motor vehicle" (emphasis added). The provision then enumerates the tasks that fall within its ambit—all of which involve individualized assessment of driver safety. *Id.* The same is true of 49 U.S.C § 31308, and 49 U.S.C. § 31311(a)(12)(B).

20

Section 31308 provides FMCSA the authority to set uniform standards for issuance of CDLs by the States—it is thus concerned with state procedures and policies, not broad eligibility rules. And Section 31311(a)(12)(B), which concerns States' issuance of CDLs to persons domiciled outside the State, does not grant FMCSA independent rulemaking authority. None of these provisions authorize the agency to categorically exclude entire classes of noncitizens from CDL eligibility. Indeed, the agency's novel assertion of rulemaking authority is particularly suspect because it hinges upon immigration status—a domain that is entirely absent from the agency's delegated authority and in which the agency has no expertise. FMCSA's foray into immigration policy runs counter to Congress's scheme governing work authorization for lawfully present immigrants.

The focus of the relevant provisions' text on individualized assessment of driver fitness is further confirmed by the legislative history and other contextual indicators. The evidence indicates that Congress sought to create a scheme of individualized assessments of driver safety, not one where FMCSA could rule broad categories of noncitizens ineligible on the basis of an asserted proxy for safety.

Indeed, Congress created a distinction between domiciled CDLs—which States issue to their own domicilaries—and non-domiciled CDLs to keep track of driver identity, not to exclude classes of persons from CDL eligibility. And FMCSA's current Rule is a dramatic departure from its past regulations, which faithfully pursued Congress's scheme by requiring that noncitizens and citizens alike individually demonstrate their safety through testing and training requirements.

Second, the Rule must be vacated as arbitrary and capricious because the rationale provided by the agency falls short of reasoned decision-making. Petitioner King County adopts and incorporates by reference the arguments on this score made by Petitioners in the consolidated case, No. 26-1032.

Third, the asserted safety rationale of the Rule is mere pretext for the agency's true motivation: furthering the immigration policy of the current administration. The rulemaking began with an Executive Order that assumed that noncitizens pose a threat to road safety and persisted despite this Court's warning that there was likely no evidence to support that assumption. The evidence tells a story of a rulemaking committed to supporting the Trump Administration's efforts to restrict

lawful immigration by associating noncitizens with illegal activity. No extra-record evidence is required. Instead, the Rule's pretextual nature is obvious from the administrative record as well as other agency actions and public statements. Indeed, the dramatic shortcomings of the FMCSA's asserted safety rationale squarely support an inference of pretext. It is implausible that the agency created such a sweeping immigration-status based eligibility rule on the basis of such a flimsy safety rationale. Rather, FMCSA made an unprecedented foray into immigration policy to further the current Administration's anti-immigrant agenda.

## ARGUMENT

The Court should vacate the Rule because it exceeds FMCSA's statutory authority. Alternatively, the Rule is arbitrary and capricious because it is not based on reasoned decision-making and is instead based on a pretextual rationale.

## I.   King County has Article III Standing.

"For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017); *see also Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5

23

(D.C. Cir. 2017) ("Economic harm to a business clearly constitutes an injury-in-fact."). "[I]njuries from car accidents, namely "death, physical injury, and property damage," are also "concrete and particularized injuries." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297 (D.C. Cir. 2007).

King County has suffered a substantial economic harm as a result of the Rule and faces further certainly impending economic harm if the Rule remains in effect. Metro employs roughly 50 bus drivers who are now ineligible under the Rule. Eldred Declaration ¶ 23. In addition, four trainees in Metro's training class were disqualified by the IFR and remain interested in pursuing a CDL in the near future if they are eligible. *Id.* ¶¶ 24, 31. Petitioner will lose the substantial investment it incurred in training those bus drivers, with the initial training program alone representing an investment of approximately $15,000 per trainee. *Id.* ¶ 31. In total, the four trainees and the 50 active bus drivers represent an investment of over $800,000 that have been or certainly will be lost without any recourse. *Id.*

The Rule also harms King County Metro by making car and bus accidents demonstrably more likely. By barring experienced, licensed

24

drivers from renewing their licenses, the Rule forces more inexperienced drivers into Metro's fleet of bus drivers. And as King County has explained, 10 years of data shows that "the longer King County Metro can keep drivers in service, the safer the service Metro provides to King County residents and visitors." *Id.* ¶ 31.

These economic and safety injuries are the direct result of the eligibility changes included in the Rule, and are redressable by an order of this Court vacating the Rule.

## II.   The Final Rule Exceeds FMCSA's Statutory Authority.

The Rule exceeds FMCSA's delegated rulemaking authority. The plain text of the statutory scheme, legislative history, and FMCSA's own past regulations demonstrate that the agency lacks the authority to make categorical judgments based on immigration status. Congress has tasked FMCSA with furthering "the highest degree of safety in motor carrier transportation." 49 U.S.C. § 113(b). But FMCSA's delegated authority to regulate road safety is not a *carte blanche* power, and certainly does not encompass the power to exclude entire classes of noncitizens (or citizens) from CDL eligibility.

25

With respect to the issuance of CDLs, Congress has authorized FMCSA to issue regulations establishing individualized assessments of driver and vehicle safety, as well as state procedures for ensuring individuals meet those standards. Congress has not authorized FMCSA to draw a line between H-2A, H-2B, and E-2 visa holders and all other noncitizens (many of whom are, like holders of these visas, lawfully present and employable in the United States). That is sensible because, as the Rule acknowledges, FMCSA has no expertise in—nor authority over—how these visa programs are administered. *See* 91 Fed. Reg. at 7050, 7060. Because the Rule is not "a valid exercise of [FMCSA's] authority," it must be vacated. *Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006).

### A.    FMCSA's Cited Statutory Provisions Do Not Authorize the Rule.

FMCSA invokes 49 U.S.C. § 31305(a), 49 U.S.C. § 31308, and 49 U.S.C. § 31311(a)(12)(B) as legal bases for the Rule. 91 Fed. Reg. at 7046. But these statutes only provide FMCSA the authority to set individualized standards for driver and vehicle safety, and state procedures for ensuring individuals meet those standards. They do not authorize the agency to categorically exclude entire classes of

26

noncitizens or indeed citizens on the view that a subset of them might pose a road safety risk.

Section 31305(a) allows FMCSA to issue regulations that pertain narrowly to ensuring the fitness of CDL applicants. Section 31305(a) states the Secretary shall "prescribe regulations on minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle," and enumerates the regulatory tasks that fall within that ambit. 49 U.S.C. § 31305(a). Subsection (a)(1), for example, tasks the Secretary with setting "minimum standards for written and driving tests." *Id.* Subsection (a)(2) directs the Secretary to require that applicants take a "driving test in a vehicle representative of the type of vehicle the individual operates or will operate." *Id.* The remaining subsections all specify similarly discrete commands involving individualized safety standards. The Rule addresses none of the subjects specified by Congress, and no subsection delegates open-ended authority to address safety as FMCSA sees fit. Those provisions certainly do not authorize FMCSA to adopt rules limiting eligibility for CDLs by using immigration status as a proxy for asserted safety concerns.

27

Nor can FMCSA lean on the 49 U.S.C. § 31305(a)'s introductory reference to "ensuring the fitness" of drivers as permitting it to categorically bar entire classes of noncitizens from obtaining CDLs, particularly where there is no "comprehensive data" supporting the asserted safety benefits. 91 Fed. Reg. at 7067. "Under the familiar interpretive canon noscitur a sociis," the phrase must be understood by "the company it keeps." *McDonnell v. United States*, 579 U.S. 550, 568–69 (2016) (citation omitted). Because the phrase is followed by a list of specific regulatory tasks that all pertain narrowly to testing individual driver safety, *see, e.g.*, 49 U.S.C. § 31305(a)(1)–(8), it cannot be understood to confer such a "radically different power" on the agency. *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 205 (2024) (cleaned up).

Section 31308 likewise does not authorize the Rule. It requires the agency to issue "regulations on minimum uniform standards for the issuance of commercial drivers' licenses" by the States. 49 U.S.C. § 31308. Congress enumerated two requirements that form the "minimum" for those State standards. *Id.* Under Subsection (1)(A), a CDL holder must "pass written and driving tests for the operation of

a commercial motor vehicle that comply with the minimum standards prescribed by the Secretary under section 31305(a)." *Id.* And under Subsection (1)(B), a CDL holder must "present certification of completion of driver training that meets the requirements established by the Secretary under section 31305(c)." *Id.* These provisions make clear that Congress understood FMCSA's authority to set standards under Section 31308 as substantially similar in scope to those the agency can issue under Section 31305. As in Section 31305, these standards are designed to measure each individual applicant's qualifications to drive a commercial vehicle—indeed, both explicitly cross-reference Section 31305. As with Section 31305, therefore, this provision does not authorize the agency to issue categorical rules that bar entire classes of lawfully present noncitizens from obtaining CDLs.

In denying Petitioner's motion to stay, this Court pointed to Section 31308, observing that the individualized-safety requirements articulated in Section 31308 "support[] no implication that the standards cannot address other safety concerns as well." Statement of Katsas at 5. The agency may certainly address other safety concerns beyond the statutory minimum set forth by Congress—but it must do so

in a way that is consistent with the standards that Congress specified. After all, "a court [does not] presume that an agency's promulgation of a rule is permissible because Congress did not expressly foreclose the possibility." *New York Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 546 (D.C. Cir. 2020) (cleaned up). And it is a "fundamental canon of statutory construction" that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)). In stating that the enumerated requirements would be the "minimum" standards for States issuing CDLs, Congress certainly did not confer the "radically different power" to categorically exclude whole classes of persons from CDL eligibility. *Harrington*, 603 U.S. at 205 (cleaned up).

Thus, under Section 31305 and Section 31308, the "standards" that the agency may adopt must be of the same nature as those direct assessments of driver safety that Congress explicitly spelled out under those sections. For example, FMCSA and its predecessor have relied on those provisions to set minimum-age requirements for commercial

30

drivers. *See* 49 C.F.R. § 391.11(b)(1) (requiring drivers of CMVs to be 21 years of age). Age is a well-recognized and direct indicator of an individual's driving safety. Indeed, the law frequently recognizes that when an individual gets older, he or she becomes more responsible. *See, e.g.*, 23 U.S.C. § 158 (national minimum drinking age). By contrast, a person does not become a safer driver simply by changing their visa status. The agency might also invoke those provisions to erect a reasonable bar to persons who have committed past bad acts or driven under the influence. Regulations to that effect reflect a judgment about an individual's driving safety on the basis of the individual's past conduct. By contrast, the Rule deems categories of persons ineligible not because of anything that the now-ineligible person has done, but rather due to a supposed population level correlation between immigration status and driving safety (indeed, one that lacks any data to support it). The Rule exceeds FMCSA's authority under these provisions.

FMCSA's remaining authority, Section 31311(a)(12)(B), is part of a list of requirements that States must comply with to avoid losing federal funding. It merely provides that States may issue non-domiciled CDLs pursuant to "regulations prescribed by the Secretary." 49 U.S.C.

31

§ 31311(a)(12)(B). By its terms, the provision does not confer distinct rulemaking authority on FMCSA—rather, the provision merely incorporates FMCSA's rulemaking authority provided elsewhere, for example in Section 31305(a) and Section 31308. Indeed, when FMCSA issued a rule revising the category of "non-domiciled commercial driver's license" for applicants domiciled outside the United States or in a State that does not issue CDLs, it did not point to this provision as its legal basis—it cited Section 31305 and Section 31308. *Commercial Driver's License Testing and Commercial Learner's Permit Standards*, 76 Fed. Reg. 26854, 26855 (May 9, 2011).

Thus, FMCSA's power "to promulgate rules with regard to non-domiciled applicants," Statement of Katsas at 6, sweeps no more broadly than its authority to set minimum standards that States can directly implement to confirm that someone is fit to drive. It certainly does not extend to the Rule here. "It would be anomalous for Congress to have so painstakingly described" the agency's authority to set individualized standards for issuing domiciled CDLs, "but to have given [it], just by implication, authority to declare an entire class of" persons ineligible to receive non-domiciled CDLs. *Gonzales v. Oregon*, 546 U.S.

32

243, 262 (2006). Yet neither this Court nor FMCSA identified a limit to the agency's reliance on Section 31311(a)(12)(B)(ii).

Nor did Congress give the agency free-ranging authority to regulate with respect to driver-history. Congress has required States to obtain applicants' driving histories from other States before issuing CDLs. 49 U.S.C. § 31311(a)(6). But the fact that Congress has statutorily spoken on the issue of domestic driving histories undermines, rather than supports, any contention that Congress intended FMCSA to make categorical CDL eligibility determinations as to noncitizens. Congress has created a robust statutory scheme regarding domestic driving histories. It requires DOT to "consult with the States" to maintain a central database "of information about the licensing, identification, and disqualification of operators of commercial motor vehicles," *id.* § 31309(a), which FMCSA has incorporated into its regulatory implementation of the domestic driving-history requirement. *See* 49 C.F.R. § 383.73(b)(3)(ii), (iv).

By contrast, Congress is silent on the issue of foreign driving histories. This silence cannot be understood to mean that FMCSA has unfettered authority to determine that certain classes of noncitizens can

33

never provide adequate driving histories sufficient to obtain CDLs. Under Sections, 31305(a), 31308, and 31311(a)(12)(B)(ii), the agency could presumably require individuals to produce credible foreign driver histories to successfully obtain a nondomiciled CDL. That is the sort of individualized assessment of qualifications that those provisions contemplate. But that is not what the Rule does. Rather, the Rule, in effect, creates an irrebuttable presumption that persons with certain immigration statuses or visa categories will be *unable* to produce credible driver histories. Nothing in the statute permits the agency to concoct that sort of proxy for commercial driving safety. Indeed, the lack of authority and irrationality here is demonstrated by the exclusion of DACA noncitizens whose *only* driving histories are domestic.

Further underscoring FMCSA's overstep is that the statutory scheme governing the issuance of CDLs is fundamentally one of cooperative federalism. It is not a scheme that facilitates collaboration between federal agencies. The statutory scheme emphasizes that FMCSA must consult the States before performing certain actions and empowers the agency to withdraw federal funding if States do not comply with its regulations. 49 U.S.C. §§ 31308, 31309(a), 31311(a). It

34

does not contemplate consulting other federal agencies that might be able to provide proxies, such as visa status, for driver fitness. It does not require, for example, DOL's Office of Foreign Labor Certification or DHS to provide formal certifications of driver-history verification. The absence of any reference to those agencies is conspicuous because Congress "knows how" to authorize the Secretary to consult with other agencies where relevant. *United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). In 49 U.S.C. § 31306, for example, Congress directed DOT to issue regulations regarding drug testing "in consultation with the Secretary of Health and Human Services." Here, however, Congress authorized no similar consultation. It did not intend to allow FMCSA to make categorical distinctions between classes of noncitizens, much less distinctions based on proxies over which the agency has no expertise or authority to enforce.

FMCSA's assertion of rulemaking authority despite Congress's silence on this point is especially suspect because FMCSA's regulation creates conflict with other federal statutes. The Supreme Court has explained that the Immigration and Naturalization Act is a "comprehensive framework" requiring that, among other things, "every

35

employer [] verify the employment authorization status of prospective employees." *Arizona v. United States*, 567 U.S. 387, 404 (2012). To be sure, federal law cannot preempt federal law. But courts have a "duty to interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). This Court should not read FMCSA's rulemaking authority to permit intrusion into Congress's comprehensive immigration scheme.

**B.    Legislative History, Statutory Context, and Regulatory History Confirm that FMCSA's Rule Exceeds Its Statutory Authority.**

Context confirms what is clear from the statutory text: FMCSA exceeded its statutory authority in issuing the Rule. The context reinforces three points evident from the text of the relevant provisions: first, Congress intended a scheme of individualized assessments of driver safety, uniformly administered by the States; second, the category of non-domiciled CDLs was a tool for confirming applicant identity, not a substantive barrier to eligibility; third, FMCSA lacks the authority to draw broad eligibility lines based on immigration status.

*First*, as demonstrated above, the legislative history of the CMVSA underscores that Congress intended a scheme of individualized

36

assessments of driver safety—not one where certain classes of individuals are excluded from CDL eligibility. As the sponsor of the bill, Senator Danforth, explained, Congress was chiefly concerned with threats posed by certain unsafe drivers, "particularly those who use drugs or alcohol," as well as a lack of uniformity and coordination between States. 32 Cong. Rec. S16919 (daily ed. Oct. 17, 1986). Congress identified "alcohol abuse as a serious problem" and determined it was "important to establish Federal standards that curb alcohol abuse by commercial drivers." S. Rep. No. 99-411, at 3 (1986)

Congress also expressed concern over lenient standards in many States, finding that "20 States will issue a license entitling any individual who merely passes a regular motorist test in a compact car to drive a tractor semi-trailer truck nationwide." S. Rep. No. 99-411, at 2. To address this safety issue, Congress did not prohibit certain categories of individuals from CDL eligibility. Instead, Congress required that FMSCA establish "minimum standards for licensing, testing, qualification, and classification of commercial drivers." 32 Cong. Rec. S16919 (daily ed. Oct. 17, 1986); *accord* S. Rep. No. 99-411, at 2; *see also* 49 U.S.C. § 31308. Congress addressed perceived threats to

37

road safety by mandating more stringent, individualized testing requirements nationwide. It did not allow FMCSA to make entire categories of potentially unsafe drivers ineligible for CDLs on the basis of an asserted proxy for safety. That directive applies to classes of noncitizens and citizens alike.

*Second*, the legislative history sheds light on the nature and purpose of Congress's distinction between domiciled and non-domiciled CDLs. That statutory distinction was not intended to serve as a barrier preventing noncitizens from obtaining CDLs. Rather, Congress was primarily concerned with preventing applicants from possessing multiple driver's licenses and thus evading licensure disqualification by "spread[ing] their traffic violations over a number of licenses, and maintain[ing] a 'good driver' rating regardless of the number of violations." S. Rep. No. 99-411, at 3. To address this concern, individuals were prohibited from holding more than one license, and States were generally limited to issuing CDLs only to their own domiciliaries. Pub. L. No. 99-570, tit. XII, §§ 12002, 12009, 100 Stat. 3207–170 (codified as amended at 49 U.S.C. §§ 31302, 31311). The CMVSA made clear, however, that States could issue CDLs to persons

38

who would be otherwise incapable of receiving a CDL—such as noncitizens. *Id.* Congress did not delegate to the Secretary unique powers to regulate State issuance of non-domiciled CDLs. Instead, it tasked the agency with developing the same types of individualized testing standards that are applied to domiciled CDLs.

Pursuant to that scheme, the Department of Transportation distinguished between drivers who obtained the licenses in their state of residence, who could obtain what the agency referred to as CDLs, and foreign drivers, who could obtain what the agency referred to as "Nonresident CDLs." 53 Fed. Reg. at 27648–49. Consistent with Congress's focus on individualized vetting of applicants, both types of CDLs were subject to the same knowledge, skills, testing, and qualification requirements. *See id.* at 27649. And consistent with Congress's concern about spreading violations between jurisdictions, DOT emphasized that "holders of a Nonresident CDL must notify the State of issuance of any disqualifications or license suspensions/revocations." *Id.* at 27636. As the agency emphasized, "[t]he Nonresident CDL will be a CDL in every sense of the term. It will differ from all other CDL s only in that it will carry the word

39

'Nonresident' on its face, and will show an address outside the United States." *Id.* at 27637.

The 1988 regulations are consistent with the scheme Congress intended: individualized procedures to ensure that each applicant—whether citizen or noncitizen—is fit to drive a commercial motor vehicle. The Rule at issue here is a dramatic departure from that scheme.

*Third*, Congress's enactment of the SAFE Port Act of 2006—which provided narrow authorization for FMCSA to limit eligibility for non-domiciled CDLs to persons lawfully present—similarly demonstrates that categorical CDL eligibility requirements must be expressly authorized by Congress. Pub. L. No. 109-347, § 703(a), 120 Stat. 1944 (2006).

The impetus for the 2006 law was a memorandum from DOT's Inspector General, which suggested requiring all CDL applicants to demonstrate legal presence in the United States, to "help prevent fraud in the program and further enhance security by verifying applicants'

40

identification."[19] Congress responded with the SAFE Port Act which required DOT to issue regulations implementing the Inspector General's recommendations regarding "legal status verification for licensed United States commercial drivers." 49 U.S.C. § 31100 note.

Congress's intervention to create a legal presence requirement reinforces the plain reading of the statutory text: FMCSMA lacks the delegated authority to craft broad eligibility rules for CDLs on the basis of characteristics such as immigration status. When Congress decided that certain a class of persons should be deemed categorically ineligible for a CDL—those not lawfully present—it specifically authorized FMCSA to issue regulations to that effect. FMCSA cannot move beyond that narrow authorization by relying on general rulemaking authorities that confer no similar power. "It is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority." *Air All. Houston v. Env't Prot. Agency*, 906 F.3d 1049, 1061 (D.C. Cir. 2018).

---

[19] Office of the Inspector General, *Memorandum: Need to Establish a Legal Presence Requirement for Obtaining a Commercial Driver's License, Department of Transportation* 3 (June 4, 2004), *available at* https://www.oig.dot.gov/sites/default/files/cc2004054.pdf.

More recently, members of Congress have once again acted in recognition of FMCSA's lack of authority to make categorical CDL eligibility determinations. On October 3, 2025, Representative Rouzer, with 15 cosponsors, introduced H.R. 5688, 119th Cong. (2025) (the "Non-Domiciled CDL Integrity Act"), which would amend 49 U.S.C. § 31311(a)(12) to require lawful immigration status and an employment-based visa as conditions for non-domiciled CDL eligibility. As with the SAFE Port Act, the introduction of this bill reflects legislative recognition that the agency lacks the delegated authority to take that step.

*     *     *

As the plain text of the statutory scheme, legislative history, and FMCSA's own past regulations demonstrate, the agency lacks the authority to impose categorical eligibility restrictions on the issuance of CDLs that are based on immigration status. The Rule here imposes that sort of eligibility restriction by limiting non-domiciled CDLs only to H-2A, H-2B, and E-2 visa holders with Forms I-94/94A. The Rule exceeds the agency's statutory authority.

42

### III. The Final Rule is Arbitrary and Capricious Because It Does Not Reflect Reasoned Decision-Making.

The Rule must be vacated because it is arbitrary and capricious. King County adopts and incorporates by reference the arguments regarding the agency's lack of reasoned decision-making made in the brief filed by Petitioners in the consolidated case *Jorge Lujan, et al v. FMCSA, et al*, No. 26-1032.

### IV. The Final Rule is Arbitrary and Capricious Because It Is Based on a Pretextual Explanation.

The Rule must also be vacated as arbitrary and capricious because its road safety justification is pretext for an alternative purpose: expanding immigration enforcement.

In reviewing agency actions, courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)). Courts can reject an agency's explanation if it "is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*; *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (a rule is arbitrary and capricious if an agency's

43

explanation "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). Rejecting "contrived" explanations ensures that "agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 784–85. Like ordinary citizens, this Court may consider public statements in assessing agency action for pretext. *See e.g., Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 312 (D.C. Cir. 2001); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 122 (2022) (Gorsuch, J., concurring) (relying on a retweet by the White House Chief of Staff) (quoting *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 17 F.4th 604, 612 & n.13 (5th Cir. 2021)).

Here, "the evidence tells a story that does not match the explanation the [agency] gave for [its] decision." *Dep't of Com.*, 588 U.S. at 784. This Court recognizes "the danger that an agency, having reached a particular result, may become so committed to that result as to resist engaging in any genuine reconsideration of the issues." *Food Mktg. Inst. v. I. C. C.*, 587 F.2d 1285, 1290 (D.C. Cir. 1978); *see also*

44

*Dep't of Com.*, 588 U.S. at 782–83 (there is "a point" at which commitment to a preordained result is impermissible). That is precisely the danger here. The rulemaking began with an Executive Order that assumed that noncitizens pose a threat to road safety and persisted despite this Court's warning that there was likely no evidence to support that assumption. The evidence tells a story of a rulemaking committed to supporting the Trump Administration's efforts to restrict lawful immigration by associating noncitizens with illegal activity, rather than documented safety issues.

From the outset, FMCSA targeted noncitizens pursuant to the Truck EO, which declared that "America's roadways have become less safe" because of drivers who are not proficient in English. 90 Fed. Reg. at 18759. The EO targeted noncitizens by directing FMCSA to review issuance of non-domiciled CDLs for "irregularities" to ensure road safety. *Id.* at 18760. The Rule rejects a comment that its true purpose is to "target immigrants by unjustly limiting their employment opportunities" by explaining that its "enhanced focus on State non-domiciled CDL issuance practices" is merely made in compliance with the Truck EO's directive. 91 Fed. Reg. at 7062–64. But the question is

45

not why FMCSA targeted noncitizens in the first place, but why the Rule makes most noncitizens ineligible for CDLs. While the Truck EO directed FMCSA to test the hypothesis that noncitizens present a road safety risk, it did not—and indeed, cannot—direct FMCSA to issue the Rule, which exceeds the agency's statutory authority and is unsupported by data.

Throughout the rulemaking process, FMCSA was irrationally committed to the Truck EO's hypothesis that noncitizens pose a threat to road safety. The Rule is the culmination of shifting explanations, the progression of which does not reflect an agency genuinely applying its expertise to solve a problem. FMCSA impermissibly issued the IFR without notice and comment because it concluded that broad eligibility for non-domiciled CDLs posed an "imminent hazard to public safety and a direct threat to national security." *Id.* at 7070. This Court stayed the IFR because FMCSA had no data supporting a relationship between noncitizens and higher crash rates. *Lujan*, 2025 WL 3182504, at *2. FMCSA still issued the Rule, even though it concedes that "[t]he necessary level of detail regarding the type of CDL held by the drivers involved" in crashes "is not available." 91 Fed. Reg. at 7065, 7099. And

46

FMCSA never seriously considered whether certain categories of non-domiciled CDL holders pose a national security risk. *See* 90 Fed. Reg. at 46514 & n.20 (acknowledging that national security concerns are not the focus of the IFR).

To compensate for the lack of any well-documented road safety problem, the Rule relies on untested premises that noncitizens are worse drivers because they lack English proficiency and that they might harbor "support for terrorism." *See* 91 Fed. Reg. at 7050. These concerns are not only speculative but also at odds with the Rule's final, equally unsupported premise: that noncitizens—who pass the same rigorous CDL testing requirements as citizens—pose a safety risk because they might have poor driving histories in their respective countries. And the Rule's rationale that the H-2A visa program (among others) ensures vetting of driving histories by employers, *id.*, is undermined by DOL's recognition that H-2A employers have a history of skirting immigration laws, 90 Fed. Reg. at 47921–22, and FMCSA's acknowledgment that operating a CMV is "often incidental" to H-2A workers' jobs. 91 Fed. Reg. at 7096. "Taken together, these deficiencies paint a picture of agency action that was not the product of reasoned decision-making, but

47

of a rushed and pre-determined agenda masked by pretext." *Nat'l TPS All. v. Noem*, 166 F.4th 739, 774 (9th Cir. 2026) (Mendoza, J., concurring).[20]

The dissonance between the Rule and its road safety justification is readily harmonized when viewed in the context of the Trump Administration's immigration enforcement agenda. The Rule is another iteration of the Administration's reliance on assertions of fraud and a handful of incidents involving noncitizens to justify sweeping restrictions on lawful immigration in excess of Congressional authority. *See e.g.*, *Mullin*, 2026 WL 1649160, at *17 (imposing a "heavy tax on the H-1B program" cannot be justified by "cursory policy rationales" that the program is systemically abused); *Dorcas Int'l Inst. of Rhode Island*, 2026 WL 1622708, at *48, 50–54 (pausing immigration benefits based on the acts of two noncitizens is unreasoned pretext for "anti-immigrant animus"). Respondents have similarly relied on the Rule—which has no effect on "illegal immigrants" (who have never been eligible for CDLs)—

---

[20] Judge Mendoza's concurrence on this point was joined by Judge Wardlaw. *See Nat'l TPS All. v. Noem*, 169 F.4th 796, 808 (9th Cir. 2026) (Mendoza, J., concurring in the denial of rehearing *en banc*) (discussing Judge Nelson's dissental regarding the precedential value of a majority concurrence in a panel opinion).

to fabricate an imminent threat by conflating lawfully present noncitizens with undocumented ones.[21] They have, for example, made public statements that there was "a surge of deadly crashes involving non-domiciled drivers last summer"[22] and that there has been "a disturbing pattern of criminal illegal aliens driving commercial vehicles on American roads, directly threatening public safety."[23] And U.S. Transportation Secretary Sean Duffy has suggested that non-domiciled CDL holders are actively killing Americans, rather than being involved in accidents.[24] By rendering most noncitizens ineligible for CDLs, the Rule supports the Administration's series of at least five immigration enforcement efforts targeting non-domiciled CDL holders, the latest of

---

[21] *See e.g.*, U.S. DEP'T TRANSP., *supra* note 17 (justifying the Rule in part by reference to "illegal immigrants").

[22] *See id.*

[23] *See* U.S. DEP'T HOMELAND SEC., *supra* note 11.

[24] *See e.g.*, Secretary Sean Duffy (@SecDuffy), X (May 20, 2026 at 7:40 PM), https://x.com/SecDuffy/status/2057290339321364950 (post by Secretary Duffy stating that he "issued [the Rule] to stop unqualified, untrained foreign drivers like this accused killer from getting CDLs to drive on America's roads"); Secretary Sean Duffy (@SecDuffy), X (Mar. 12, 2026 at 3:39 PM), https://x.com/SecDuffy/status/2032224953353855410 ("[A]n ILLEGAL ALIEN TRUCKER . . . plowed his semi into a van, killing 4 Amish men").

which was accompanied by a press release that cites the Rule.[25] Considering the lack of reasoned decision-making and Respondents' public statements, it is likely that the Rule exempts H-2A and H-2B visa holders not because they are uniquely screened for driving history, but because they are essential to the economy. *See* 90 Fed. Reg. at 47924–25 (recognizing the importance of the H-2A program in addressing labor shortages); 91 Fed. Reg. at 5040 (making additional H-2B visas available "only to those American businesses that are suffering or will suffer impending irreparable harm").

In declining to stay the Rule, the Court explained that "probing the Executive's 'motivation represents a substantial intrusion into the workings of another branch of Government.'" Statement of Katsas at 10 n.3 (quoting *Dep't of Com.*, 588 U.S. at 781). But that principle is irrelevant because the Rule's pretextual nature is obvious from the administrative record and further supported by other agency actions and public statements.[26] And although there is a "presumption that

---

[25] *See* U.S. CUSTOMS & BORDER PROT., *supra* note 14.

[26] King County has a pending motion to complete the administrative record with factual information about labor certification and visa application processes provided to FMCSA by DOL's Office of Foreign Labor Certification and DHS. Mot. to Complete Admin. Record

public officials have properly discharged their official duties," *id.* (quoting *Hight v. DHS*, 135 F.4th 996, 1008 (D.C. Cir. 2025)), it is rebutted by FMCSA's failure to "examine the relevant data and articulate a satisfactory explanation for its action"—a failure that is underscored by the more plausible rationale of expanding immigration enforcement. *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 498 (D.C. Cir. 1988) (quoting *State Farm*, 463 U.S. at 43).

## CONCLUSION

The Rule is but one in a series of actions, Executive Orders, and rules promulgated by the Trump Administration that are a concerted effort to bypass Congress's authority over immigration. By rendering most noncitizens ineligible for CDLs, the Rule supports a broader agenda of discouraging immigration by denying rights and benefits to lawfully present, employable noncitizens.

FMCSA's effort to conduct immigration policy by another name is unlawful for three reasons. First, the Rule exceeds the agency's statutory authority. FMCSA's clearly delineated authority over the

---

(June 4, 2026). If it is granted, King County will discuss any additional evidence in its reply.

51

issuance of CDLs does not permit the agency to bar entire categories of persons from obtaining CDLs on the basis that immigration status is a proxy for safety. Second, the Rule's proffered safety justification falls well short of reasoned decision-making. Third, the Rule's unreasoned road safety justification is mere pretext to furthering the current Administration's immigration policy.

For the foregoing reasons, this Court should vacate the Final Rule.

Respectfully submitted,

By: */s/ Paul J. Lawrence*
    Paul J. Lawrence
    Kevin J. Kennedy
    Eugene Lee
    PACIFICA LAW GROUP LLP
    401 Union Street, Suite 1600
    Seattle, WA 98101-2668
    (206) 240-1700

*Counsel for Petitioner*

June 15, 2026

52

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,737 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Paul J. Lawrence*
Paul J. Lawrence

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

> */s/Paul J. Lawrence*
> Paul J. Lawrence

2

**ADDENDUM**

## TABLE OF CONTENTS

49 U.S.C. § 31305 (excerpt)..................................................................................A1

49 U.S.C. § 31308..................................................................................A5

49 U.S.C. § 31311 (excerpt)..................................................................................A7

**49 U.S.C. § 31305 (excerpt)**

**§ 31305. General driver fitness, testing, and training**

**(a) Minimum Standards for Testing and Fitness.**—The Secretary of Transportation shall prescribe regulations on minimum standards for testing and ensuring the fitness of an individual operating a commercial motor vehicle. The regulations—

> **(1)** shall prescribe minimum standards for written and driving tests of an individual operating a commercial motor vehicle;
>
> **(2)** shall require an individual who operates or will operate a commercial motor vehicle to take a driving test in a vehicle representative of the type of vehicle the individual operates or will operate;
>
> **(3)** shall prescribe minimum testing standards for the operation of a commercial motor vehicle and may prescribe different minimum testing standards for different classes of commercial motor vehicles;
>
> **(4)** shall ensure that an individual taking the tests has a working knowledge of—
>
>> **(A)** regulations on the safe operation of a commercial motor vehicle prescribed by the Secretary and contained in title 49, Code of Federal Regulations; and
>>
>> **(B)** safety systems of the vehicle;
>
> **(5)** shall ensure that an individual who operates or will operate a commercial motor vehicle carrying a hazardous material—

A1

**(A)** is qualified to operate the vehicle under regulations on motor vehicle transportation of hazardous material prescribed under chapter 51 of this title;

**(B)** has a working knowledge of—

**(i)** those regulations;

**(ii)** the handling of hazardous material;

**(iii)** the operation of emergency equipment used in response to emergencies arising out of the transportation of hazardous material; and

**(iv)** appropriate response procedures to follow in those emergencies; and

**(C)** is licensed by a State to operate the vehicle after having first been determined under section 5103a of this title as not posing a security risk warranting denial of the license.

**(6)** shall establish minimum scores for passing the tests;

**(7)** shall ensure that an individual taking the tests is qualified to operate a commercial motor vehicle under regulations prescribed by the Secretary and contained in title 49, Code of Federal Regulations, to the extent the regulations apply to the individual; and

**(8)** may require—

**(A)** issuance of a certification of fitness to operate a commercial motor vehicle to an individual passing the tests; and

**(B)** the individual to have a copy of the certification in the individual's possession when the individual is operating a commercial motor vehicle.

A2

**(b) Requirements for Operating Vehicles.—**

**(1)** Except as provided in paragraph (2) of this subsection, an individual may operate a commercial motor vehicle only if the individual has passed written and driving tests that meet the minimum standards prescribed by the Secretary under subsection (a) of this section to operate the vehicle and has a commercial driver's license to operate the vehicle.

**(2)** The Secretary may prescribe regulations providing that an individual may operate a commercial motor vehicle for not more than 90 days if the individual—

**(A)** passes a driving test for operating a commercial motor vehicle that meets the minimum standards prescribed under subsection (a) of this section; and

**(B)** has a driver's license that is not suspended, revoked, or canceled.

**(c) Standards for Training.—**Not later than 1 year after the date of enactment of the Commercial Motor Vehicle Safety Enhancement Act of 2012, the Secretary shall issue final regulations establishing minimum entry-level training requirements for an individual operating a commercial motor vehicle—

**(1)** addressing the knowledge and skills that—

**(A)** are necessary for an individual operating a commercial motor vehicle to safely operate a commercial motor vehicle; and

A3

**(B)** must be acquired before obtaining a commercial driver's license for the first time or upgrading from one class of commercial driver's license to another class;

**(2)** addressing the specific training needs of a commercial motor vehicle operator seeking passenger or hazardous materials endorsements;

**(3)** requiring effective instruction to acquire the knowledge, skills, and training referred to in paragraphs (1) and (2), including classroom and behind-the-wheel instruction;

**(4)** requiring certification that an individual operating a commercial motor vehicle meets the requirements established by the Secretary; and

**(5)** requiring a training provider (including a public or private driving school, motor carrier, or owner or operator of a commercial motor vehicle) that offers training that results in the issuance of a certification to an individual under paragraph (4) to demonstrate that the training meets the requirements of the regulations, through a process established by the Secretary.

…..

A4

**49 U.S.C. § 31308**

**§ 31308. Commercial driver's license**

After consultation with the States, the Secretary of Transportation shall prescribe regulations on minimum uniform standards for the issuance of commercial drivers' licenses and learner's permits by the States and for information to be contained on each of the licenses and permits. The standards shall require at a minimum that—

**(1)** an individual issued a commercial driver's license—

>  **(A)** pass written and driving tests for the operation of a commercial motor vehicle that comply with the minimum standards prescribed by the Secretary under section 31305(a); and

>  **(B)** present certification of completion of driver training that meets the requirements established by the Secretary under section 31305(c);

**(2)** before a commercial driver's license learner's permit may be issued to an individual, the individual must pass a written test, that complies with the minimum standards prescribed by the Secretary under section 31305(a), on the operation of the commercial motor vehicle that the individual will be operating under the permit;

**(3)** the license or learner's permit be tamperproof to the maximum extent practicable and each license or learner's permit issued after January 1, 2001, include unique identifiers (which may include biometric identifiers) to minimize fraud and duplication; and

**(4)** the license or learner's permit contain—

>  **(A)** the name and address of the individual issued the license or learner's permit and a physical description of the individual;

A5

**(B)** the social security account number or other number or information the Secretary decides is appropriate to identify the individual;

**(C)** the class or type of commercial motor vehicle the individual is authorized to operate under the license or learner's permit;

**(D)** the name of the State that issued the license or learner's permit; and

**(E)** the dates between which the license or learner's permit is valid.

**49 U.S.C. § 31311 (excerpt)**

**§ 31311. Requirements for State participation**

**(a) General**.—To avoid having amounts withheld from apportionment under section 31314 of this title, a State shall comply with the following requirements:

> **(1)** The State shall adopt and carry out a program for testing and ensuring the fitness of individuals to operate commercial motor vehicles consistent with the minimum standards prescribed by the Secretary of Transportation under section 31305(a) of this title.
>
> **(2)** The State may issue a commercial driver's license to an individual only if the individual passes written and driving tests for the operation of a commercial motor vehicle that comply with the minimum standards.
>
> ….
>
> **(11)** The State may issue a commercial driver's license to an individual who has a commercial driver's license issued by another State only if the individual first returns the driver's license issued by the other State.
>
> **(12)**
>
>> **(A)** Except as provided in subparagraphs (B) and (C), the State may issue a commercial driver's license only to an individual who operates or will operate a commercial motor vehicle and is domiciled in the State.
>>
>> **(B)** Under regulations prescribed by the Secretary, the State may issue a commercial driver's license to an individual who—
>>
>>> **(i)** operates or will operate a commercial motor vehicle; and

A7

**(ii)** is not domiciled in a State that issues commercial driver's licenses.

**(C)** The State may issue a commercial driver's license to an individual who—

**(i)** operates or will operate a commercial motor vehicle;

**(ii)** is an active duty member of—

**(I)** the armed forces (as that term is defined in section 101(a) of title 10); or

**(II)** the reserve components (as that term is defined in section 31305(d)(2) of this title); and

**(iii)** is not domiciled in the State, but whose temporary or permanent duty station is located in the State.

**(13)** The State shall impose penalties consistent with this chapter that the State considers appropriate and the Secretary approves for an individual operating a commercial motor vehicle.

**(14)** The State shall allow an individual to operate a commercial motor vehicle in the State if—

**(A)** the individual has a commercial driver's license issued by another State under the minimum standards prescribed by the Secretary under section 31305(a) of this title;

**(B)** the license is not revoked, suspended, or canceled; and

**(C)** the individual is not disqualified from operating a commercial motor vehicle.

**(15)** The State shall disqualify an individual from operating a commercial motor vehicle for the same reasons and time periods

A8

for which the Secretary shall disqualify the individual under subsections (b)–(e), (i)(1)(A) and (i)(2) of section 31310.

**(16) (A)** Before issuing a commercial driver's license to an individual, the State shall request the Secretary for information from the National Driver Register maintained under chapter 303 of this title (after the Secretary decides the Register is operational) on whether the individual—

> **(i)** has been disqualified from operating a motor vehicle (except a commercial motor vehicle);

> **(ii)** has had a license (except a license authorizing the individual to operate a commercial motor vehicle) revoked, suspended, or canceled for cause in the 3-year period ending on the date of application for the commercial driver's license; or

> **(iii)** has been convicted of an offense specified in section 30304(a)(3) of this title.

**(B)** The State shall give full weight and consideration to that information in deciding whether to issue the individual a commercial driver's license.

….

A9